# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Penncro Associates, Inc.,**

    **Plaintiff,**

**v.**                **Case No. 04-2549-JWL**

**Sprint Corporation; Sprint/United**
**Management Company; and Sprint**
**Spectrum L.P. d/b/a Sprint PCS,**


    **Defendants.**


## MEMORANDUM & ORDER

Plaintiff Penncro Associates, Inc. filed this suit against defendants (collectively, "Sprint") alleging that Sprint breached a three-year multi-million dollar contract between the parties under which plaintiff was to provide first-party inbound collections services for Sprint PCS. This matter is presently before the court on plaintiff's motion for summary judgment as to liability (doc. 107) and defendant's motion for summary judgment as to plaintiff's claims for damages (doc. 109). As set forth more fully below, plaintiff's motion is granted and defendant's motion is granted with respect to plaintiff's claim for punitive damages and is otherwise denied.


## I. Facts

The facts pertinent to the court's resolution of the pending motions are largely undisputed. Plaintiff is an outsource provider in the accounts receivables industry. Headquartered in Southampton, Pennsylvania, plaintiff also maintains a facility in McAllen, Texas. Sprint is engaged

in, among other things, the provision of wireless telecommunications services throughout the United States. In 2002, Sprint decided to outsource the collection of unpaid cell phone bills. Sprint initially chose three outside collection agencies–GC Services, Risk Management Alternatives, Inc. (RMA) and Penncro–to handle inbound collections work. In April 2002, Sprint and Penncro entered into a written Master Services Agreement (MSA) effective from April 20, 2002 through April 30, 2005. The MSA contemplated that Sprint and Penncro would enter into Contract Orders for the provision of services by Penncro to Sprint and set forth certain standard terms that would apply to any such Contract Orders. The MSA itself did not obligate Penncro to provide services and did not obligate Sprint to order or pay for services; these obligations stemmed only from an executed Contract Order. Sprint executed similar MSAs with GC Services and RMA.

On May 6, 2002, Sprint and Penncro executed a Contract Order pursuant to which Penncro agreed to provide, and Sprint agreed to pay for, first-party inbound collection services for Sprint PCS at Penncro's McAllen, Texas facility for a three-year period ending May 31, 2005. The Contract Order attached and incorporated by reference Attachment A, titled "Inbound Collections Incentive Program." This attachment described the evaluation, competitive ranking, incentive and disincentive criteria applicable to Penncro and the competing suppliers of inbound collections services (GC Services and RMA, who received similar Contract Orders and were also subject to the Incentive Program).

Pursuant to Attachment A, Sprint prepared and disseminated to Penncro and competing suppliers competitive evaluation "scorecards" on a monthly or more frequent basis. These

2

scorecards evaluated and ranked a supplier's performance based on six Key Performance Indicators (KPIs) as set forth in Attachment A.  Each of the KPIs was assigned a specific weight based on its relative importance to Sprint.  For example, the total number of dollars collected and total credit card dollars were both assigned a weight of 30 percent while quality control was assigned a weight of 10 percent.  A supplier's score was measured on a 100-point scale based on the supplier's performance in each of the six weighted KPIs.  Ultimately, a supplier's success was measured on two levels–its performance measured against Sprint's expectations (as defined in Attachment A) and its performance measured against competing suppliers in the same KPIs.  Each month, the first and second place suppliers received incentive bonuses; the third place supplier did not receive an incentive bonus.  In addition to the performance-based incentives offered under Attachment A to the Contract Order, Attachment A specifically permitted Sprint to enforce "performance-based disincentives."  Under this provision of Attachment A, Sprint was permitted to terminate the Contract Order "in the event that Supplier is in 3rd place for 6 months or more consecutively."

It is undisputed that Attachment A provided for a 90-day delay after an initial "ramp up" period for the incentive program and that the target start date for the incentive program was September 1, 2002, a date that was later changed to October 1, 2002 via an Addendum to Attachment A.  According to plaintiff, the September 1, 2002 target start date (or October 1, 2002 as amended) also applied to the competitive evaluation process for purposes of the disincentive portion of Attachment A, such that the 6-month period set forth in the termination clause could not begin until October 1, 2002 and would end on March 31, 2003.  Defendant contends that there

3

was no 90-day delay in the start date for the disincentive portion of the competitive evaluation process such that the six-month period set forth in the termination clause began immediately after the initial "ramp up" period, or July 1, 2002, and ended on December 31, 2002. In any event, Sprint began issuing scorecards to its suppliers in July 2002.[1] In the six-month period from July 2002 through December 2002, Penncro received five monthly scorecards reflecting a last-place ranking. In November 2002, however, Penncro received a second-place ranking.

In January 2003, Sprint terminated the Contract Order with Penncro. The letter in which Sprint notified Penncro that it was terminating the contract stated as follows:

> This Contract Order is being terminated for cause under Attachment A, "Disincentive." From July through December 2002, a total of six months straight, Penncro Associates, Inc.'s performance was at third place or below in a total of the six Key Performance Indicators. Termination of the Contract Order is effective February 17, 2003.

Thereafter, plaintiff filed suit for breach of contract, alleging that Sprint terminated the contract without cause because the six-month period did not begin until October 2002 and, thus, had not ended at the time of the termination and, in any event, Penncro did not rank last in any consecutive six-month period as evidence by its November 2002 second-place ranking.

## II.   Summary Judgment Standard

---

[1]According to plaintiff's evidence, Sprint issued "preliminary" scorecards beginning in July 2002 to "test" the scoring process, to ascertain whether the weight assigned to each KPI was appropriate, and to determine whether all aspects of a supplier's performance were captured by the scoring process. Sprint denies that these scorecards were "preliminary" and urges that it began issuing scorecards in July 2002 because that is when the evaluation period began for purposes of the termination clause.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the

event of trial from which a rational trier of fact could find for the nonmovant.  *Id.* (citing Fed. R. Civ. P. 56(e)).   To accomplish this, sufficient evidence pertinent to the material issue   "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).


**III.    Sprint's Liability for Breach of Contract**

The court begins with plaintiff's motion for summary judgment on Sprint's liability for breach of contract.   In its motion, plaintiff alleges that Sprint terminated the contract without cause[2] because the six-month period set forth in the termination clause of Attachment A to the Contract Order did not begin until October 2002 and, thus, had not ended at the time of the termination and, in any event, Penncro did not rank last in any consecutive six-month period as evidenced by its November 2002 second-place ranking.   Sprint urges in response that disputed factual issues preclude the entry of summary judgment on liability.   According to Sprint, ample evidence in the record supports its assertion that the six-month period set forth in the termination clause began as early as June 2002 and ample evidence suggests that plaintiff ranked in last place

---

[2]While the MSA permitted a party to terminate the contract for convenience, the Contract Order expressly excluded termination for convenience.  The parties do not dispute, therefore, that Sprint could terminate the Contract Order only for cause.

for six consecutive months, regardless of the overall second-place ranking in November 2002, based on Sprint's method of measuring a supplier's performance. As explained below, the court concludes that the contractual language unambiguously establishes that the six-month period set forth in the termination clause of Attachment A to the Contract Order (and, thereafter, in the Addendum to Attachment A) began in October 2002. Sprint, then, terminated the Contract Order without cause by purporting to rely on plaintiff's performance over a six-month evaluation period when only three months of that evaluation period had expired. Summary judgment in favor of plaintiff on Sprint's liability for breach of contract is appropriate and the court declines to address the alternative argument that, even if the six-month evaluation process began in June, plaintiff did not rank in third place for six consecutive months.

The parties agree that Kansas law applies to this dispute. Under Kansas law, the construction of a written contract is a matter of law for the court. *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 577 (2002). A "cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if the intention is consistent with legal principles." *Hollenbeck v. Household Bank*, 250 Kan. 747, 751 (1992). Where a written contract is plain and unambiguous, the court must interpret the contract solely within its four corners, without regard to extrinsic or parol evidence. *Clark v. Wallace County Co-op. Equity Exchange*, 26 Kan. App. 2d 463, 465 (1999).[3] As an element of contractual

---

[3]Even if the court could consider extrinsic evidence, the court notes that Sprint has not proffered any evidence suggesting that the parties, at the time of negotiation, discussed that the evaluation period for purposes of the termination clause would begin in June or July 2002 or that the parties discussed that the October 1, 2002 start date applied only to the incentive

construction, whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "language of doubtful or conflicting meaning" based on a reasonable construction of the contract's language. *See Marshall v. Kansas Medical Mut. Ins. Co.*, 276 Kan. 97, 111 (2003). Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324 (1998). Finally, the provisions of a written contract must be interpreted as a whole rather than in isolation, and all writings that are part of the same transaction are interpreted together. *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1005 (1999); *Restatement (Second) of Contracts* § 202(2).

With these rules in mind, the court turns to the specific contractual language before it. In its entirety, Attachment A to the Contract Order, titled the "Inbound Collections Incentive Program," addresses the competitive evaluation process. Attachment A begins with an "overview" of the "champion/challenger" environment in which the suppliers will compete and goes on to explain the Key Performance Indicators. After the overview and the section discussing the KPIs, Attachment A contains a heading entitled, "Evaluation Timeframe," which states that the "competitive evaluation process will commence 90 days after the full live ramp up. Target date for start of evaluation process is September 1, 2002." A subsequent Addendum to Attachment A contains identical language, but reflecting a start date of October 1, 2002. Attachment A then

_____

portion of the evaluation program.

describes the incentive bonus for suppliers who rank first and second and explains the scoring system for ranking suppliers.  Finally, in a section entitled "Disincentive," Attachment A states:

> In addition to the performance-based incentives offered in this program, [Sprint] reserves the right to enforce the following performance-based disincentives.
>
> * * * *
>
> **Six Months Consecutive 3rd Place performance**: In the event that Supplier is in 3rd place for 6 months or more consecutively, [Sprint] may terminate this Contract Order for cause as described in Section D.

The question, then, is whether the October 1, 2002 start date for the competitive evaluation process also applies for purposes of the six-month period set forth in the termination clause. Without hesitation, the court concludes that the October 1, 2002 date applies.

Critically, the termination clause expressly references a supplier's "3rd place" ranking. This ranking clearly relates to the competitive evaluation process that is the sole subject of Attachment A, for a supplier's rank is itself determined through the competitive evaluation process, an evaluation process that expressly begins on October 1, 2002.  It defies logic to suggest that a supplier could receive a 3rd place ranking in July or August 2002 for purposes of the termination clause when the competitive evaluation process itself (from which the rankings are determined) did not begin until October 2002.  Simply put, the six-month period set forth in the termination clause, by referencing a supplier's rank, plainly contemplates that the suppliers be engaged in the competitive evaluation process which did not begin until October 2002.

In sum, while the termination clause viewed in isolation does not contain an express 90-day delay after the ramp up period and does not contain an express start date, the termination clause,

when viewed together with the Contract Order itself and all the provisions in Attachment A, clearly reveals that the parties intended that the six-month evaluation period would begin on October 1, 2002. *See In re Cherokee County, Kansas Health Care Facility Revenue Bonds*, 262 Kan. 941, 953 (1997) (parties' intent is not determined by critical analysis of a single or isolated provision but by construing all provisions together and in harmony with each other). Because Sprint terminated the Contract Order only three months into the evaluation period, Sprint's termination was in breach of the contract's terms. Summary judgment in favor of plaintiff on the issue of Sprint's liability is warranted.[4]

## IV.   Plaintiff's Claims for Damages

The court turns, then, to Sprint's motion for summary judgment on plaintiff's claims for damages. In the pretrial order, plaintiff seeks "direct contract damages" of $34 million, measured

---

[4]Sprint suggests that the language of Section D of the Contract Order suggests that the six-month period for purposes of the termination clause began on June 1, 2002. In relevant part, Section D states that "[i]n the event that [Sprint] moves to terminate this Contract Order for cause as defined in the Master Agreement or as defined in Attachment A to this Contract Order within the first 12 (twelve) months of operation, beginning on June 1, 2002 and ending on June 1, 2003, the start up cost incurred by [Sprint] associated with bringing connectivity to Supplier location[(s) shall be reimbursed to [Sprint] by Supplier." The June 1, 2002 start date described in Section D might tend to suggest that the start date for purposes of the termination clause in Attachment A was also June 1, 2002 if Section D were limited to terminations as defined in Attachment A (because the only avenue for terminating the contract for cause described in Attachment A is the six-month consecutive last-place performance provision). However, Section D plainly applies also to terminations for cause as defined in the MSA, which permits termination for any material breach. The June 1, 2002 date set forth in Section D, then, is not significant in construing the start date for the six-month evaluation period for the termination clause in Attachment A.

10

as the benefit of the bargain plus prejudgment interest.[5]   Plaintiff also seeks punitive damages, asserting that Sprint's conduct was "willful, grossly negligent or fraudulent."   According to Sprint, plaintiff cannot recover as direct contract damages what plaintiff's expert calls "the contractual shortfall of revenue" because such damages are barred by the express, unambiguous terms of the MSA and plaintiff cannot recover punitive damages because such damages are not available for the breach of contract alleged here.   Plaintiff, in turn, contends that the express, unambiguous terms of the MSA unambiguously permit plaintiff to recover the direct contract damages that it seeks to recover.   Plaintiff further argues that the parties specifically contracted for the right to recover punitive damages if the other party's breach was willful, grossly negligent or fraudulent.   As set forth below, the court concludes that the terms of the MSA plainly permit plaintiff to recover the category of direct contract damages and that the MSA does not permit plaintiff to recover punitive damages for Sprint's breach.   Sprint's motion for summary judgment, then, is granted in part and denied in part.

Sprint's motion turns on the construction of the limitation of damages provision found in Section 13 of the MSA.  That provision states as follows:

Neither party will be liable to the other for consequential, indirect or punitive damages for any cause of action, whether in contract, tort or otherwise, except for:

---

[5]As an alternative to its claim for direct contract damages, plaintiff asserts a claim for "disgorgement" in the amount of $16.9 million, the economic benefit that Sprint realized as a result of its termination of the Contract Order.  Defendant moves for summary judgment on this claim as well.  However, because the court concludes that plaintiff is entitled to pursue its claim for direct contract damages, the court need not further address the claim for disgorgement.

a) Damages (as defined above in Section 12.1) for which a party has an obligation of indemnity under this agreement;

b) Any grossly negligent, willful or fraudulent act or omission; or

c) Any breach of Section 9.0 or 17.10.

Consequential damages include, but are not limited to, lost profits, lost revenues and lost business opportunities, whether or not the other party was or should have been aware of the possibility of these damages.

It is undisputed that plaintiff is seeking revenues lost as a direct result of Sprint's breach.   Sprint, then, asserts that such damages are not recoverable because section 13 precludes any party from recovering consequential damages, which are defined to include "lost profits" and "lost revenues."

According to Sprint, section 13 plainly defines "consequential damages" to include lost profits and lost revenues, regardless of whether those lost profits and revenues are direct or indirect.    Sprint contends that plaintiff's argument that the phrases "lost profits" and "lost revenues" are limited to only indirect lost profits and indirect lost revenues renders those phrases mere surplusage because damages for indirect lost profits and indirect lost revenues are always considered consequential and, thus, the parties would have had no reason to describe those specific categories of consequential damages in section 13.    The court is not persuaded by Sprint's contention.   Parties to written agreements often reiterate the law in their agreements and the fact that the parties here have simply spelled out various categories of what would be considered consequential damages under Kansas law does not render such language surplusage.   Moreover, the fact that the parties have also defined consequential damages to include "lost business

12

opportunities," a category of indirect damages that is always considered consequential, significantly undermines Sprint's argument that the parties must have meant something other than indirect lost profits and indirect lost revenues.  Clearly, then, the parties, in drafting section 13, were simply attempting to define consequential damages as that phrase is commonly understood under Kansas law–that is, damages for economic harm suffered by a party beyond direct economic loss or ordinary loss of bargain damages.

While Sprint concedes that consequential damages are commonly understood to include only those damages for economic harm suffered by a party beyond direct economic loss or ordinary loss of bargain damages, it contends that parties to a contract are free to define terms however they like and to displace commonly understood meanings of terms–something that, according to Sprint, the parties did in this case by defining consequential damages to include direct and indirect lost profits and revenues.  Quoting Corbin, Sprint argues:

> Ordinary English words can be deprived of their ordinary meaning and supplied with others–even with meanings that are the exact opposite of their ordinary ones.  White can be made to mean black, five can be made to mean ten, 500 feet can be made to mean 100 inches, and Bunker Hill Monument can be made to signify Old South Church.

5 *Corbin on Contracts* § 24.8 (rev. ed. 1998).  This point is simply inapposite here.  As explained in the footnote to this excerpt, Corbin was expressing a view contrary to Oliver Wendell Holmes, who had, in a Harvard Law Review article published in 1899, opined that parties to a written agreement could not prove with *extrinsic* evidence that the parties "had orally agreed upon a special private usage for certain common words or numbers."  *See id*. § 24.8 n.156.  According to Corbin, then, extrinsic evidence should be permitted–if convincing–to prove that the parties

13

agreed that words used in a written instrument would have a different meaning from the common one. In this case, even if the court were permitted under Kansas law to consider it, Sprint has offered absolutely no extrinsic evidence that the parties contemporaneously understood or otherwise agreed that the phrase "consequential damages" as used in section 13 would preclude recovery of direct lost profits and direct lost revenues.

While Sprint directs the court to two well-reasoned cases in which courts have construed limitation of liability clauses to preclude recovery of direct lost profits, the language of the particular clauses in those cases differs from the clause in this case in significant respects. In *Imaging Systems Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124 (Ga. App. 1997), the pertinent clause provided that neither party "will be liable to each other . . . for any lost profits or any incidental, special or consequential damages." *Id*. at 126. The court held that the clause covered all lost profits, not just those that could be considered consequential. *Id*. at 127. As the court noted, however, the clause expressly excludes "any" lost profits (a term the court construed in context to mean "all") and lost profits are separately listed in the contract as another category of damages that, in addition to consequential damages, are prohibited. *Id*. Here, of course, section 13 does not preclude "any" lost profits and lost profits are included in the definition of consequential damages rather than set forth as a separate and distinct category of damages. Similarly, in *Continental Holdings, Ltd. v. Leahy*, 132 S.W.3d 471 (Tex. App. 2003), the pertinent clause provided that "neither [party] shall bear any liability to the other for . . . loss of profits, loss of business or any other indirect or consequential damages." *Id*. at 475. The court held that the clause covered all lost profits, whether direct or indirect. Central to the court's

conclusion, however, was that a direct lost profits remedy was entirely inconsistent with another key provision in the contract–an early termination remedy that clearly limited one party's recovery of damages to a time period that simply would not encompass direct lost profits.  *Id*. at 476-77.

Finally, the court concludes that Sprint's construction of section 13 is nonsensical when viewed in light of the principal purpose of the parties' agreement–Sprint's compensation for plaintiff's provision of services.  *Restatement (Second) of Contracts* § 202(1) (in interpreting contracts, "the principal purpose of the parties . . . is given great weight"); *Arnold v. S.J.L. of Kansas Corp*., 249 Kan. 746 (1991) ("Results which vitiate the purpose . . . of the contract to an absurdity should be avoided.").  Pursuant to the parties' agreement, plaintiff agreed to invoice Sprint on a monthly basis for services rendered during the previous 30 days and Sprint agreed to pay all undisputed amounts within 45 days of receipt of the invoice.  Under Sprint's construction of section 13, if "consequential damages" is broad enough to include any lost profits, whether direct or indirect, it must be broad enough to include any lost revenues, whether direct or indirect.  Direct lost revenues, of course, would include amounts invoiced by plaintiff and owed but unpaid by Sprint.  Thus, under Sprint's theory, plaintiff would have no recourse in damages if Sprint refused to pay a monthly invoice for services rendered.[6]  This construction is not reasonable.

To conclude, the court's rejects Sprint's argument that section 13 unambiguously precludes plaintiff from recovering damages for direct economic loss and, instead, finds that the only

---

[6]Sprint suggests in its reply brief that plaintiff does, in fact, have recourse but that recourse is limited to reliance interest damages such as plaintiff's start-up costs.  This suggestion, however, simply finds no support in the contract language.

reasonable interpretation of section 13 is that it precludes recovery of only those lost profits and lost revenues beyond direct economic loss or ordinary loss of bargain damages.   The court's conclusion is consistent with other courts that have analyzed similar limitation of damages provisions.  *See Coremetrics, Inc. v. AtomicPark.com, LLC*, 2005 WL 3310093, at *4 (N.D. Cal. Dec. 7, 2005) (where contract precluded party from recovering "consequential damages including . . . damages for loss of profits," court concluded that provision unambiguously barred recovery of indirect damages only and rejected defendant's argument that provision barred plaintiff from recovering lost profits as direct damages); *Combustion Systems Servs., Inc. v. Schuylkill Energy Resources, Inc*., 1993 WL 496946, at *2-3 (E.D. Pa. Nov. 19, 1993) (where contract precluded party from recovering "consequential damages . . . including . . . damages for loss of anticipated profits [and] revenues," court concluded that provision did not preclude plaintiff from recovering direct damages).   Sprint's motion for summary judgment on this issue is denied and plaintiff will be permitted to seek damages for direct economic loss.  *See Restatement (Second) of Contracts* § 203(a) ("an interpretation which gives a reasonable . . . meaning to all the terms is preferred to an interpretation which leaves a part unreasonable").

With respect to plaintiff's claim for punitive damages, Sprint contends that plaintiff cannot recover punitive damages because such damages are not available under Kansas law for breach of contract.   Plaintiff responds that the parties specifically contracted in section 13 for the right to recover punitive damages if the other party's breach was willful, grossly negligent or fraudulent. As explained below, the court agrees with Sprint that punitive damages are not available to plaintiff in this case and grants summary judgment to Sprint on this issue.

16

Under Kansas law, a party is not permitted to recover punitive damages in an action based solely on a theory of breach of contract. *CIT Group/Sales Financing, Inc. v. E-Z Pay Used Cars, Inc.*, 29 Kan. App. 2d 676, 684 (2001) (citing *Farrell v. General Motors Corp.*, 249 Kan. 231, 247 (1991). Even if the breach is intentional and unjustified, punitive damages are not available unless an independent tort is present. *Farrell*, 249 Kan. at 247. While plaintiff agrees with this statement of Kansas law, plaintiff contends that the parties, in section 13 of the MSA, specifically contracted around Kansas law by permitting a party to recover punitive damages for a willful breach.[7] Plaintiff asserts that the plain language of section 13 unambiguously permits plaintiff to recover punitive damages in a breach of contract action upon a showing that Sprint engaged in "grossly negligent, willful or fraudulent" conduct.

The court rejects plaintiff's interpretation of section 13 as contrary to the plain language of that section. Simply put, section 13 does not state that punitive damages are available for a breach that is grossly negligent, willful or fraudulent. Of course, the term "breach" does not appear anywhere in the text of subsection (b) of section 13. Rather, that subsection refers to a "grossly negligent, willful or fraudulent act or omission" and, thus, clearly contemplates that punitive damages must be predicated on the commission of an independent tort. In other words, section 13 simply restates the law in Kansas–that a party is not permitted to recover punitive damages in an action based solely on a theory of breach of contract but must show the existence

---

[7]While the court is not permitted to consider extrinsic evidence of the parties' intent when the pertinent contract language is unambiguous on its face, the court notes that plaintiff has not proffered any evidence suggesting that the parties contemporaneously understood that section 13 was modifying Kansas law on the issue of punitive damages.

of an independent tort. *See CIT Group/Sales Financing, Inc.*, 29 Kan. App. at 684; *Restatement (Second) of Contracts* § 355 ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."). Summary judgment, then, is granted in favor of Sprint on plaintiff's claim for punitive damages.[8]

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion for summary judgment as to liability (doc. 107) is **granted** and defendant's motion for summary judgment as to plaintiff's claims for damages (doc. 109) is **granted** as to plaintiff's claim for punitive damages and is **otherwise denied**.

**IT IS SO ORDERED.**

---

[8]In its brief, plaintiff references an opinion rendered by Magistrate Judge Waxse in this case and states that Judge Waxse expressly concluded that plaintiff's interpretation of section 13 on the issue of punitive damages is "not unreasonable." It is unclear whether plaintiff is suggesting that the court should defer to Judge Waxse's decision or whether plaintiff is suggesting that Sprint has somehow waived this issue by failing to object to Judge Waxse's ruling. Regardless, Judge Waxse's prior ruling has no relevance here. That decision was rendered in the context of ruling on Sprint's Rule 12(f) motion to strike allegations of motive from plaintiff's complaint. Plaintiff argued that Sprint's motive was relevant based on its interpretation of section 13–that a willful breach permitted it to recover punitive damages. In denying the motion to strike, Judge Waxse simply noted that plaintiff's "argument was not unreasonable" and that "[s]hould plaintiff's interpretation prevail, plaintiff would be entitled to such damages if [Sprint's] conduct is proved to be willful." *See Penncro Assocs., Inc. v. Sprint Corp.*, 2005 WL 950626, at *2-3 (D. Kan. Apr. 25, 2005). Judge Waxse, then, did not purport to interpret section 13 nor was he required to do so for purposes of the motion to strike.

18

Dated this 22nd day of February, 2006, at Kansas City, Kansas.


                                        s/ John W. Lungstrum
                                        John W. Lungstrum
                                        United States District Judge