# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Penncro Associates, Inc.,**

   **Plaintiff,**

**v.**              **Case No. 04-2549-JWL**

**Sprint Spectrum L.P. d/b/a Sprint PCS,**

   **Defendant.**

## MEMORANDUM & ORDER

   Plaintiff Penncro Associates, Inc. ("Penncro") filed this suit against Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint")[1] alleging that Sprint breached a contract between the parties under which plaintiff was to provide first-party inbound collections services for Sprint and seeking damages for the breach. On the parties' motions for summary judgment, the court concluded that Sprint's termination of its contract with Penncro was in breach of the contract's terms and entered summary judgment in favor of Penncro on the issue of Sprint's liability. The court also concluded that the terms of the parties' contract did not permit Penncro to recover punitive damages for Sprint's breach and entered summary judgment in favor of Sprint on Penncro's claim for punitive damages.

   Over the course of three days in April 2006, a trial to the court was held on the issue of Penncro's claims for damages for direct economic loss and prejudgment interest. The court has

---

[1]While Penncro initially filed suit against three separate Sprint defendants, Penncro subsequently stipulated to the dismissal of two of those defendants, leaving the sole defendant as Sprint Spectrum L.P. d/b/a Sprint PCS.

thoroughly considered the evidence and arguments presented at trial and is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  For the reasons set forth fully below, the court concludes that Penncro is entitled to recover damages for direct economic loss in the amount of $17,136,612.00 and that Penncro is not entitled to an award of prejudgment interest.

I.      **Findings of Fact**

Penncro is an outsource provider in the accounts receivables industry.  Headquartered in Southampton, Pennsylvania, Penncro also maintains a facility in McAllen, Texas.  Sprint has its principal place of business in Overland Park, Kansas and is engaged in, among other things, the provision of wireless telecommunications services throughout the United States.  In 2002, Sprint decided to outsource the collection of unpaid cell phone bills rather than continuing to use in-house customer service agents to handle collections.  Sprint initially chose three outside collection agencies–GC Services, L.P., (GC Services) Risk Management Alternatives, Inc. (RMA) and Penncro–to provide first-party inbound collections services.[2]

---

[2]First-party collections work refers to work done by a collection agency in the client's name; that is, Penncro would represent itself as Sprint and the customer from whom Penncro was attempting to collect would not realize that he or she was talking to an employee of a third party.  In first-party collections work, the relationship between the collector and the client is a close one and the client maintains a significant degree of control over the collector's work.  In contrast, third-party work refers to work done by a collection agency in its own name.  In third-party collections work, the relationship between the collector and the client is an arm's length one.

Inbound collections refers to a process called "hotlining," whereby the service provider

In April 2002, Sprint and Penncro entered into a written Master Services Agreement (MSA) effective from April 20, 2002 through April 30, 2005.  The MSA contemplated that Sprint and Penncro would enter into Contract Orders for the provision of services by Penncro to Sprint and set forth certain standard terms that would apply to any such Contract Orders.  Such standard terms included a provision precluding the oral modification of any term of the agreement or any term of a Contract Order.  Specifically, section 17.15 of the MSA states that a Contract Order "may not be amended or modified except in writing signed by a duly authorized representative of each party."  In addition, section 17.7 of the MSA, which addresses waiver, states that the "waiver of a breach of any term or condition of this Agreement will not constitute the waiver of any other breach of the same or any other term" and that a waiver must be in writing to be enforceable.

In early May 2002, Sprint and Penncro executed a Contract Order pursuant to which Penncro agreed to provide first-party inbound collection services for Sprint at Penncro's McAllen, Texas facility for a three-year period ending May 31, 2005.  Section C of the Contract Order between Sprint and Penncro obligated Penncro to maintain staffing levels sufficient to provide 80,625 "productive hours" per month.  A "productive" hour includes only "available time, talk time, hold time and wrap-up time" spent by a Penncro employee.  In other words, a productive hour

---

reroutes a delinquent customer's cellular calls to a call center and the call is answered by an employee of the collector.  As explained at trial, inbound calls were routed to each of the three collectors by an "intelligent call routing" system–basically a computerized process that instantaneously sent a particular call to whichever collector would be able to answer the call first (a determination that was based on the number of employees that the particular collector had who were logged into the system and, thus, available to take calls as well as the collector's average handling time per call).  In contrast, outbound collections work refers to collections work initiated by the collector, who decides which customers to contact.

includes time when an employee is logged into the system and is waiting and available to receive a call; time spent talking to a customer on a call; time when a customer is placed on hold momentarily while the employee verifies information; and time spent entering information on the system after a collections call.  Pursuant to section B of the Contract Order, Sprint was obligated to pay Penncro at the rate of $22.00 per productive hour.

Section C further obligated Penncro to maintain a specific supervisor-to-employee ratio and a specific manager-to-supervisor ratio.  That is, Penncro was required to maintain a ratio of one supervisor for every 15 "full-time equivalents" or full-time employees (FTEs) and one manager for every 5 supervisors.  The Contract Order provides that one FTE equals 161.25 productive hours per month; thus, because Penncro was required to maintain staffing levels sufficient to provide 80,625 hours per month, or 500 FTEs, Penncro was obligated to staff 40 managers and supervisors per month.  Pursuant to section B of the Contract Order, Sprint was obligated to pay Penncro a flat rate of $4500.00 per manager or supervisor per month.

Section C of the Contract Order also set forth Sprint's obligation to Penncro.  In relevant part, section C provides as follows:

> Supplier agrees to maintain staffing levels at the McAllen, Texas facility at 80,625 productive hours (64,500 for English support and 16,125 Spanish language support) per month and [Sprint] to pay for 80,625 productive hours per month.  These productive hours are subject to change under the terms and conditions of the Incentive Program detailed in Attachment A to this Contract Order.

Attachment A, in relevant part, states as follows:

> In the event that Supplier is in 3rd place for 3 months or more consecutively, or scores below 100 points for 3 consecutive months, [Sprint] may permanently reduce the number of productive hours requested of the Supplier by no more than

20%.   This reduction will result in a corresponding reduction of the amount of guaranteed productive hours outlined in Section C of the Contract Order.

According to Penncro, Sprint, in Section C, promised to pay for 80,625 productive hours per month, regardless of whether Sprint actually called upon Penncro to provide that number of hours per month.   Sprint urges that Section C is ambiguous and that the parties never intended that Sprint "guarantee" a number of hours per month.   Although evidence was presented at trial concerning the parties' intent with respect to the nature of Sprint's obligation under Section C, the court need not render any factual findings with respect to that evidence because, as explained in its conclusions of law, the court ultimately concludes that Section C is unambiguous and requires Sprint to pay Penncro for 80,625 productive hours per month regardless of whether Sprint actually called upon Penncro to provide those hours.

Attachment A of the Contract Order sets forth the "incentive program" through which Sprint measured Penncro's performance.   The incentive program was essentially a competitive evaluation process used to rank the performance of each of the collection agencies.   Pursuant to the incentive program, Sprint issued "scorecards" to each of the collection agencies on a monthly basis reflecting each collector's performance based on six Key Performance Indicators (KPIs) including, by way of example, total dollars collected; average call handling time; and staffing level. The staffing level KPI reflected the collector's success in having the number of employees available to take calls in each half-hour increment (from 6:00am through midnight) that Sprint, on a daily basis, forecasted would be necessary to meet the anticipated call volume in those half-hour

5

increments.[3]   A collector's success was measured on two levels–its performance measured against Sprint's expectations and its performance measured against the other two collection agencies. While the incentive program provided for various incentive bonuses, the program also permitted Sprint to terminate the Contract Order with Penncro if Penncro's performance was deficient over a six-month evaluation period.   Pursuant to section D of the Contract Order, Sprint was required to give Penncro thirty days' written notice of its intent to terminate the Contract Order under the terms set forth in Attachment A (i.e., based on Penncro's performance).   In addition, section D provided for a three-month "ramp down period" after the effective date of the termination of the Contract Order during which staffing levels would gradually decrease.

The Contract Order (or, more specifically, Attachment A to the Contract Order) also provided for an initial "ramp up period" such that the competitive evaluation process did not begin until October 1, 2002.   During the ramp up period, Penncro experienced numerous problems that affected its performance and its ability to provide 80,625 productive hours to Sprint. Significantly, the McAllen facility, while new to Penncro, had previously housed a telemarketing firm and the vast majority of the 750 employees that Penncro hired between the middle of May 2002 and the middle of June 2002 to work as collectors on the Sprint contract had been employed by the telemarketing firm as telemarketers.   In other words, Penncro's employees, almost without

---

[3]The half-hour increment method of measuring a collector's staffing level was not instituted until October 1, 2002, when Sprint issued an addendum to Attachment A and modified this particular KPI. Prior to October 1, 2002, the KPI was focused less on the collector's staffing level and more on the collector's service level; the KPI measured the number of phone calls per half-hour that a collector was able to answer within 35 seconds.

exception, had no experience in collections work.  Moreover, Penncro's management team at the McAllen facility were largely inexperienced in first-party inbound collections work and the magnitude of the Sprint contract amplified that inexperience.  Penncro's Vice President of Collections, Hunter Croft, had virtually no experience with first-party inbound collections work and Penncro was not able to hire a site manager until late June 2002 when it hired Joe Petri, an individual who had collections experience but little inbound experience.

Other problems affected Penncro's performance, including a very high employee turnover rate and poor employee attendance.  The evidence at trial demonstrated that Penncro was often late in delivering paychecks to its employees and that the amount of those paychecks was often incorrect.  Employees were frustrated and quit their employment.  For some period of time, the air conditioning unit at the facility did not work and employees simply stopped coming to work.  The bathrooms at the facility did not function properly, providing yet another reason why employees did not want to work at the facility.  On some days, as many as 70 employees would not show up for a scheduled shift.  On other occasions, Penncro was forced to terminate the employment of large numbers of employees due to instances of employee fraud, such as improperly crediting the accounts of local customers and signing in for work and then leaving for the day only to come back to sign out of work.

During this period of time, Penncro, though Mr. Croft and Mr. Petri, had daily contact with Sprint, through Scott Marshall, a Senior Manager of Collections, and Mark Botello, the vendor manager assigned to the Penncro contract.  Sprint, then, was well aware of the problems that Penncro was experiencing at the McAllen facility and the parties, beginning as early as May 2002,

began to discuss the number of productive hours that Penncro would actually be able to provide to Sprint in a given month.   Specifically, Mr. Croft and Mr. Marshall negotiated each month the number of productive hours that Penncro would be expected to provide to Sprint in that month. Without exception, Penncro never sought to provide more hours than Sprint was willing or able to give it.   Rather, Sprint was always pressing Penncro to increase its staffing levels such that Penncro could provide additional hours to Sprint.   At the same time, however, Sprint did not need Penncro to provide 80,625 productive hours in the early months of the contract because Sprint's call volume was not high enough to mandate that number of productive hours.

Despite Sprint's contractual obligation to pay Penncro for a minimum of 80,625 productive hours each month, Sprint never paid Penncro for 80,625 productive hours in any month.   Penncro, however, never billed Sprint for 80,625 productive hours and never complained that Sprint did not pay Penncro for 80,625 productive hours.   As explained by Paul Crowley, Penncro's CEO, Penncro did not bill Sprint for 80,625 hours or complain about Sprint's failure to pay for the guaranteed number of hours because the parties were in the early stages of the contract, he did not want to "cause a problem" with the project and he fully expected Sprint to meet its obligation over the course of the three-year contract.   Similarly, despite Penncro's contractual obligation to maintain staffing levels sufficient to provide 80,625 productive hours per month, Penncro never provided that number of hours to Sprint.   Sprint did not complain that Penncro was not providing 80,625 productive hours per month (in fact, Sprint's call volume was not high enough such that Sprint would have had 80,625 productive hours' worth of work for Penncro even if Penncro had been able to provide it) and, instead, sought input from Penncro each month on the number of

8

productive hours that Penncro would be able to provide in light of its performance problems.   In late September 2002, Mr. Botello sent an e-mail to Mr. Croft and Mr. Petri notifying them that Sprint, effective October 1, 2002, was going to reduce the number of FTEs to 350 FTEs, or the equivalent of 56,437.5 productive hours per month, based on "lower than expected call volume." Penncro did not object to this reduction.   In fact, the reduction was consistent with the average number of hours that Penncro was able to provide based on its staffing levels.

The competitive evaluation process began in October 2002 and Penncro's performance began to improve.   By this time, Penncro had hired additional administrative staff, including human resources personnel.   Moreover, the passage of time resulted in an increase in the experience level of Penncro's employees.   Mr. Croft also implemented an action plan to address many of the performance-related problems Penncro was experiencing at the McAllen facility.   For example, quality monitoring was a significant part of the action plan.   Penncro began monitoring the collections calls of its employees and then giving those employees feedback and coaching.   While the action plan had a positive impact on the performance of the McAllen facility, that impact was negated in late 2002 when Mr. Crowley hired a new person to manage Penncro's quality department and she decided to immediately cease all quality monitoring at the McAllen facility. At that point, Penncro again saw a decline in its performance at the McAllen facility.   Morever, while Penncro had managed to control many of its employee-related problems, Penncro still experienced staffing problems into 2003, including an ongoing problem of employees not showing up for work and Penncro's failure to schedule enough employees to handle the anticipated call volume.   By early January 2003, Penncro only employed 319 employees at the McAllen facility,

a number that, by Penncro's own admission, was "dangerously low."

On January 17, 2003, Sprint provided Penncro with written notice that it was terminating the Contract Order pursuant to a provision in Attachment A which allowed Sprint to terminate the contract if Penncro was "in 3rd place for 6 months or more consecutively" as compared to the other suppliers in the competitive evaluation process.[4]   The parties then initiated the three-month ramp down period during which time Penncro's productive hours were gradually reduced until the end of May 2003 at which time Penncro no longer provided first-party inbound collections services for Sprint.   During the ramp down period, Penncro's performance improved significantly and it was able to meet Sprint's expectations in terms of the KPIs.   Penncro's ability to meet Sprint's performance goals during this period was largely dependent on the fact that Penncro's call volume decreased significantly during the ramp down period, but was also due to the gradual increase in experience level of Penncro's employees and the fact that Penncro was simply doing a better job of managing the McAllen facility.   At the end of May 2003, the ramp down period came to a close and Penncro ceased all first-party inbound collections work for Sprint.

After Sprint terminated the Contract Order, Penncro secured additional business for its McAllen facility.   Specifically, Penncro obtained a third-party outbound collections contract with Sprint as well as collections contracts with AT&T and a large utility company.[5]   John Griffin, Penncro's Assistant Vice President of Business Development, began soliciting the Sprint

---

[4]As the court has previously concluded in ruling on Penncro's motion for summary judgment, Sprint's termination was in breach of the terms of the Contract Order.

[5]For an explanation of third-party outbound collections work, see *supra* note 2.

outbound work in early January 2003 when he responded to a Request for Proposal (RFP) issued by Sprint.     Penncro was awarded the contract several months later.    Conflicting testimony was presented as to the reasons why Penncro received the outbound work from Sprint.    Penncro's evidence suggested that Sprint awarded the contract to Penncro because of Penncro's improved performance during the ramp down period and Mr. Griffin's efforts to secure the work.    Scott Marshall, however, testified that he "pulled some strings internally" with the individuals who manage the third-party work as a "personal favor" to Mr. Croft once the first-party work was terminated and that Mr. Griffin had nothing to do with the decision to give the work to Penncro. Mr. Marshall also denied that Penncro's performance during the ramp down period played a part in the decision to award the third-party work to Penncro.    According to Mr. Marshall, he and Mr. Croft had become friends during their working relationship and, upon notification of the contract termination, Mr. Croft asked Mr. Marshall to help him secure some third-party work for the McAllen facility.    Mr. Marshall, who felt bad for Mr. Croft that the contract had been terminated, agreed to do so and ultimately made a recommendation to Michael Bray, who at the time was Sprint's Vice President of Receivables Management.    Mr. Bray testified that he approved the decision to send the work to Penncro based on Mr. Marshall's recommendation.

The court is ultimately persuaded by the testimony of Mr. Marshall, whom the court found highly credible, and finds that Sprint would not have awarded the third-party work to Penncro but for the termination of the first-party contract.    In fact, Mr. Marshall testified that Sprint simply would not have given the third-party work to Penncro if Penncro were still doing the first-party work.    As explained by Mr. Marshall, Penncro did not have the capacity in the McAllen facility to

do additional work while still performing the first-party contract and, more significantly, Sprint and Penncro were having "more than a difficult time having to focus on the first party" work such that Mr. Marshall could not "imagine giving them the third party [work] to try to manage as well." The court is convinced that Sprint would not have awarded the third-party work to Penncro at the same time that Penncro was performing the first-party work in the light of Penncro's struggle to meet its goals with respect to the first-party work.[6]

The court is also persuaded that Penncro realized an incremental net profit of $1,145,250.00 from the Sprint outbound work. Although Mr. Crowley testified during his direct examination that Penncro did not realize a profit from the third-party work, his testimony was not supported by financial statements or any other evidence. Moreover, on cross-examination Mr. Crowley admitted that he had no reason to disagree with records indicating that Penncro earned $2.75 million in revenue from the third-party work. In addition, James LaSala, Penncro's chief financial officer, tacitly conceded that Penncro earned a profit from the third-party work on an incremental basis. In that regard, when asked during his examination whether Penncro "made

---

[6]Mr. Bray also testified on cross-examination that Penncro received the third-party work because of Penncro's solid performance during the ramp down period. Penncro argues that Mr. Bray's testimony conflicts with Sprint's argument that Penncro received the third-party work as a direct result of Sprint's termination of the first-party work (and, more specifically, because Mr. Marshall felt bad for Mr. Croft and was trying to help him out in light of the termination of the first-party work). Mr. Bray's testimony, however, is entirely consistent with the court's conclusion that Penncro would not have received the work but for the termination of the first-party contract. That is, the court believes that while Penncro would not have been awarded the third-party contract if its performance during the ramp down period had been poor, the decision to award the contract to Penncro was based entirely on Mr. Marshall's desire to "soften the blow" from the termination of the first-party work.

money" on the contract, Mr. LaSala asked, "On a net income basis or incrementally?"   After Penncro's counsel clarified that he was inquiring whether Penncro made money on a net income basis, Mr. LaSala responded, "On a net income basis it was probably break even or a loss," suggesting that Penncro earned a profit on an incremental basis.   This is consistent with the testimony of Sprint's expert, Charles E. Finch, who testified that based on his review of the relevant documents, Penncro realized a net incremental income of $1,145,250.00 from the Sprint third-party contract.

With respect to Penncro's outbound work for AT&T, Mr. Griffin testified that he began soliciting outbound work from AT&T in November 2002, prior to the termination of the Sprint first-party inbound contract.   At the time he solicited the work, Mr. Griffin proposed to AT&T that Penncro would do the work at the McAllen facility because that facility had experienced collectors working on the Sprint contract who could do AT&T's work seamlessly in light of that experience.   Penncro was awarded the AT&T work in February 2003, during the ramp down period on the Sprint contract, and performed the AT&T work at the McAllen facility.   The court finds that Penncro had the physical capacity to do the work at the McAllen facility regardless of whether it was still performing the Sprint contract.   Without exception, Penncro's witnesses testified at trial that Penncro had the capacity at the McAllen facility to do additional work even while performing the Sprint first-party inbound work.   In that regard, the McAllen facility was equipped with a total of 432 seats  and only 300 of those seats were needed for the Sprint contract.   McAllen, then, had an additional 132 seats that were wired for outbound work and which were not being used for the Sprint contract.

Nonetheless, the court is persuaded that Penncro would not have been able to perform the AT&T work but for the termination of the Sprint first-party inbound contract.  Regardless of whether Penncro had seats available for the AT&T work, the court is convinced that Penncro, if still performing the Sprint contract, would not have been able to fill those seats with employees in light of the significant staffing problems faced by Penncro at the McAllen facility.  In early January 2003, Penncro employed only 319 people at the site despite its best efforts to maintain a much higher number to perform the Sprint contract.  Penncro was unable to maintain a competent, reliable workforce large enough to handle the Sprint contract; it is not conceivable that Penncro would have been able to hire and maintain a sufficient number of employees to do the AT&T work when it could not achieve the same for the Sprint contract.[7]  The court is also persuaded, based on Mr. Finch's testimony that was undisputed by Penncro, that Penncro realized an incremental net profit of $6,520,222.00 from the Sprint outbound work.

## II.     Conclusions of Law

Having previously concluded that Sprint is liable to Penncro for breach of contract, the

---

[7]In finding that Penncro would not have been able to perform the AT&T contract if it were still performing the first-party work for Sprint, the court is not persuaded by Sprint's argument that Penncro understood that the McAllen facility was to be dedicated exclusively to Sprint work such that Penncro would not have taken the At&T work but for the termination. The court believes that if Sprint in fact required a dedicated facility from its collectors, then the Contract Order would have contained an express provision addressing that issue.  Thus, while the court ultimately finds that Penncro would not have been able to perform the AT&T work but for the termination of the Sprint work, that finding is based entirely on Penncro's staffing problems and related performance issues at the McAllen facility and is not based on the notion that the McAllen facility was dedicated exclusively to Sprint work.

court is left with the issue of the amount of damages suffered by Penncro as a result of Sprint's breach. Ordinarily, contract damages are based upon the injured party's "expectation interest," as measured by

> (a) the loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus

> (b) any other loss, including incidental or consequential loss, caused by the breach, less

> (c) any cost or other loss that [the injured party] has avoided by not having to perform.

*Restatement (Second) of Contracts* § 347 (1981); *accord Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 408 (1994) ("Expectation damages usually consist of lost profits plus any incidental or consequential losses caused by the breach."); *Vanderpool v. Higgs*, 10 Kan. App. 2d 1, 3 (1984) ("Contract law protects the expectation interest of contracting parties based on a voluntary agreement that defines their relationship. If a breach occurs, fulfillment of the expectation interest gives the non-breaching party the benefit of his bargain, to put him in the position he would have been had there been no breach."); E. Allan Farnsworth, *Contracts* § 12.9 (2d ed. 1990).

A.    *Loss in Value*

The threshold issue the court must resolve in ascertaining the loss in value that Penncro sustained as a result of Sprint's breach is whether Sprint, under section C of the Contract Order, promised to pay Penncro for 80,625 productive hours regardless of whether Sprint actually called upon Penncro to provide that number of productive hours. Resolution of this issue, then, turns on

15

the court's construction of the language of section C.

The parties agree that Kansas law applies to this dispute pursuant to section 17.6 of the MSA. Under Kansas law, the construction of a written contract is a matter of law for the court. *O'Bryan v. Columbia Ins. Group*, 274 Kan. 572, 577 (2002). A "cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if the intention is consistent with legal principles." *Hollenbeck v. Household Bank*, 250 Kan. 747, 751 (1992). Where a written contract is plain and unambiguous, the court must interpret the contract solely within its four corners, without regard to extrinsic or parol evidence. *Clark v. Wallace County Co-op. Equity Exchange*, 26 Kan. App. 2d 463, 465 (1999). As an element of contractual construction, whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "language of doubtful or conflicting meaning" based on a reasonable construction of the contract's language. *See Marshall v. Kansas Medical Mut. Ins. Co.*, 276 Kan. 97, 111 (2003). Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 324 (1998). Finally, the provisions of a written contract must be interpreted as a whole rather than in isolation, and all writings that are part of the same transaction are interpreted together. *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1005 (1999); *Restatement (Second) of Contracts* § 202(2).

With these rules in mind, the court turns to the specific contractual language before it. In its entirety, section C of the Contract Order states as follows:

> Supplier agrees to maintain staffing levels at the McAllen, Texas facility at 80,625 productive hours (64,500 for English support and 16,125 Spanish language support) per month and [Sprint] to pay for 80,625 productive hours per month. These productive hours are subject to change under the terms and conditions of the Incentive Program detailed in Attachment A to this Contract Order. Supplier agrees not to exceed 80,625 productive hours per month without prior written approval by [Sprint]. In addition Supplier agrees to maintain a ratio of 1 (one) supervisor to 15 (fifteen) FTE, and 1 (one) manager to 5 (five) supervisors. For the purpose of this ratio one (1) FTE equals 161.25 productive hour [sic] per month.

Sprint, then, has made an unqualified promise to pay for 80,625 productive hours per month without regard to whether it actually called upon Penncro to provide those hours. Significantly, section C states that the productive hours are subject to change as set forth in Attachment A to the Contract Order. Attachment A, in turn, makes only one reference to a change in productive hours and cross-references section C of the Contract Order:

> In the event that Supplier is in 3rd place for 3 months or more consecutively, or scores below 100 points for 3 consecutive months, [Sprint] may permanently reduce the number of productive hours requested of the Supplier by no more than 20%. This reduction will result in a corresponding reduction of the amount of guaranteed productive hours outlined in Section C of the Contract Order.

This provision expressly provides that the productive hours referenced in section C are "guaranteed" productive hours which, of course, supports the court's conclusion that section C unambiguously requires Sprint to pay for 80,625 productive hours regardless of whether Sprint called upon Penncro to provide those hours. No other provisions in the MSA, in the Contract Order or in Attachment A are inconsistent with the court's interpretation of section C. *See In re Cherokee County, Kansas Health Care Facility Revenue Bonds*, 262 Kan. 941, 953 (1997) (parties' intent is not determined by critical analysis of a single or isolated provision but by construing all provisions together and in harmony with each other).

17

The evidence at trial reflected that Sprint removed the word "guaranteed" from the October 1, 2002 addendum to Attachment A without seeking Penncro's consent to the change and without notifying Penncro of the change.  Sprint argued at trial that the removal of the word suggested that the parties never intended for Sprint to guarantee a certain number of hours.  In other words, Sprint contends that its removal of the word was consistent with the parties' intent such that the court should consider that evidence in interpreting section C.  As explained above, the court cannot, under Kansas law, consider that evidence as section C is unambiguous.  Moreover, while the removal of the word "guaranteed" in the addendum to Attachment A might support an argument that the word was mistakenly used in the initial Attachment A such that Sprint should be entitled to a reformation of the Contract Order, Sprint simply never preserved the issue of mistake or reformation.  Sprint's counsel urged during closing argument that the removal of the word clearly suggested that it was mistakenly used in Attachment A, but Sprint never raised this issue in any pleadings at any time throughout the case, including the pretrial order.[8]  Finally, to the extent Sprint's removal of the word could be construed as a modification of the parties' agreement (assuming, without deciding, that Sprint's unilateral act could modify the agreement, *see Guy Pine,*

---

[8]Sprint also raised for the first time in closing argument that whatever the nature of its obligation under section C, it should be excused from the performance of that obligation by virtue of Penncro's prior material breach of its obligation to maintain staffing levels sufficient to provide 80,625 productive hours each month.  Because this issue was raised by Sprint for the first time at closing argument, the issue is waived. *Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir. 2002) (claims, issues, defenses, or theories of damages not included in the pretrial order are waived).  Moreover, as explained below, Sprint, through its course of conduct prior to the termination of the contract, waived Penncro's breach of its obligation to maintain the requisite staffing level.

18

*Inc. v. Chrysler Motors Corp.*, 201 Kan. 371, 376 (1968) ("One party to a contract cannot unilaterally change the terms of the contract.")), Sprint never argued at any time, not in its pleadings or even at closing argument, that this change was a modification of the parties' agreement; it argued only that this change reflected the parties' original intent at the time the Contract Order was executed. These arguments, then, are not before the court. *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (claims, issues, defenses, or theories of damages not included in the pretrial order are waived).

Sprint contends that an interpretation of section C which finds that it promised to pay for a guaranteed number of hours is illogical in light of testimony at trial concerning custom in the industry with respect to a "guaranteed" number of hours and the parties' course of conduct (*e.g.*, Penncro's failure to bill for 80,625 hours and its failure to complain that Sprint had not paid Penncro for 80,625 hours in any month).[9] In support of its argument, Sprint urges the court to look to Restatement (Second) of Contracts § 202 which "provides for admission of extrinsic evidence" in the form of trade usage, course of dealing and course of performance "in the interpretation of contracts, regardless of whether any ambiguity is discerned." 5 *Corbin on*

---

[9]While Sprint urges that any conclusion that it would have promised to pay for a guaranteed number of hours is unreasonable and that it would not have done so under any circumstances, plaintiff's counsel offered an explanation during closing argument as to why the parties may have so bargained–Penncro had invested two million dollars in start-up costs to be able to perform the contract and surely sought some assurance (through a guaranteed hours provision) that it would be able to recoup its investment. While no evidence was presented suggesting that the parties bargained for this provision based on Penncro's investment (and the court could not consider such extrinsic evidence even if it had been presented), the court simply points out that a guaranteed hours provision is not inherently unreasonable in this situation.

*Contracts* § 24.7 at 34-35 (rev. ed. 1998).  As explained by Farnsworth,

> Under the newer, more liberal view, championed by Corbin and followed by the Restatement Second, the parol evidence rule does not apply at all to matters of interpretation.  Integrated and unintegrated agreements are treated alike, and extrinsic evidence of prior negotiations is always admissible as long as it is used for the purpose of interpretation.  The court need not first determine that the language is unclear, as it must do under the restrictive view.

*See* Farnsworth, *supra*, § 7.12 at 522.   The restrictive or "plain meaning" view permits consideration of extrinsic evidence of trade usage, course of dealing and course of performance "only if the language in the writing is unclear, in the sense of being ambiguous or vague."  *See id*. § 7.12 at 520.

According to Corbin, the plain meaning rule is "wholly illogical" as it may exclude proof of the parties' actual intention–a result entirely inconsistent with the cardinal rule of contract interpretation that the purpose of interpretation is to ascertain the intention of the parties.  Corbin, *supra*, § 24.7 at 37.  Although Corbin notes a "trend toward abolishing the plain meaning rule," *id*. § 24.7 at 39, Kansas has consistently adhered to the traditional approach in interpreting contracts under which the court may not consider extrinsic evidence and must give effect to a contract's plain meaning if the contract's language is unambiguous, regardless of what the parties subjectively thought or intended.  *See McGinley v. Bank of America, N.A.*, 279 Kan. 426, 440 (2005) ("The problem with this argument is that the [documents] are clear and unambiguous on their faces. Accordingly, there is no need to resort to parol evidence, *i.e.*, conduct of a party which might aid in interpretation of those documents."); *Farrell v. General Motors Corp*., 249 Kan. 231, 241 (1991) ("If the . . . contract was ambiguous, then the parties' conduct would be relevant in

interpreting the contract. However, because the contract is unambiguous, conduct is not relevant." (citation omitted)); *Fairlawn Plaza Dev., Inc. v. Fleming Co.*, 210 Kan. 459, 465 (1972) ("When language used is clear and unambiguous, the intention of the parties and the meaning of a contract are to be deduced from the content of the instrument alone."); *Peoples Ice & Fuel Co. v. Dickey Oil Co.*, 145 Kan. 351 (1937) ("It is clear that evidence of custom and usage may not be received to vary or contradict the terms of a contract nor may it be received to make a contract where the parties had made none."); *Wood v. Ozark Pipeline Co.*, 142 Kan. 333 (1935) ("where the contract is clear and unambiguous, courts will not resort to the rule of practical interpretation by the conduct of the parties"); *Hezlep v. A-1 Oil & Gas Co.*, 112 Kan. 661 (1923) (proper office of usage and custom is to make certain that which is ambiguous; usage and custom cannot be used to alter the terms of a contract free from ambiguity).   Having concluded that section C is unambiguous, the court, pursuant to Kansas law, rejects Sprint's invitation to consider extrinsic evidence in interpreting section C.[10]

Sprint attempts to argue an ambiguity where none exists by noting the grammatical or typographical error in the first sentence of section C; that is, a verb is missing before the phrase

---

[10]During the examination of John Stevenson, Penncro objected to the admission of evidence concerning the parties' intent as to Sprint's obligation under section C of the Contract Order.  The court retained those objections under advisement and now sustains those objections pursuant to the parol evidence rule.  As explained below, however, the court considers the parties' course of performance in analyzing whether any waiver or modification of the agreement occurred and concludes that the parties' course of performance is nonetheless consistent with the court's interpretation of Section C; that is, the parties' course of performance, contrary to Sprint's argument, does not reflect that Sprint did not agree to pay for a guaranteed number of hours.

"to pay for 80,625 productive hours per month."   According to Sprint, the contract necessarily requires interpretation by the court (and, thus, is ambiguous) because the court must supply the missing word.   Even Sprint's counsel, however, concedes that the missing verb, without much question, is "agrees."   In any event, "[e]rrors in contracts, which do not create such inconsistency that the overall intent of the parties cannot be determined from the four corners of the instrument, do not result in an ambiguous contract but merely create an inconsistency subject to interpretation by the court considering the contract as a whole." *Starr v. Union Pacific Railroad Corp.*, 31 Kan. App. 2d 906, 909-10 (2003) (citing *Brown v. Lang*, 234 Kan. 610, 614-15 (1984) (typographical error in contract does not necessarily render the contract ambiguous)).   Because the court's ability to ascertain the intent of the parties from the four corners of the Contract Order is not affected by the missing word in the first sentence of section C, the missing word does not render the contract ambiguous.

Sprint also urges that the Contract Order is ambiguous because the "Scope of Services" provision in section A of the Contract Order does not provide for a guaranteed number of productive hours.   However, nothing in the Scope of Services section is inconsistent with the court's interpretation of section C and the absence of any language in section A addressing the issue of Sprint's obligation to pay for 80,625 hours is not relevant, particularly when Attachment A expressly provides that the hours are "guaranteed."   The court, then, is not persuaded by this argument.   *See Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1005 (1999) (the provisions of a written contract must be interpreted as a whole rather than in isolation, and all writings that are part of the same transaction are interpreted together).

Finally, the court notes the language of section C of the Contract Orders that Sprint executed with GC Services and RMA. Section C of the Contract Order with GC Services obligates Sprint to pay GC Services "for up to 48,400 productive hours per month." Section C of the Contract Order with RMA obligates Sprint to pay RMA "for 72,600 total productive hours per month if supplier provides the same." The language of these Contract Orders clearly limits Sprint's obligation to pay for only those hours provided by the collector. The court has not considered the language of these contracts in deciding whether the language of section C in the Contract Order executed by Penncro is unambiguous; it simply highlights the contrasting language in these Contract Orders to emphasize that Sprint knew precisely how to draft a Contract Order that did not include a guaranteed number of productive hours but did not draft such an agreement with Penncro.

Having determined that the Contract Order unambiguously requires Sprint to pay for 80,625 productive hours per month regardless of whether Sprint called upon Penncro to provide those hours,[11] the court turns to consider whether the parties, at any time, modified that agreement or

---

[11]Because of this conclusion, the court does not need to address the issue of whether Penncro, during an RFP process initiated by Sprint in 2004 during which all of Sprint's first-party collections vendors lowered their rates, would have similarly lowered its rates. The court, then, sustains on relevance grounds Penncro's objection to the testimony of John Jones on this subject. Even if the testimony were somehow deemed relevant, the court is simply not persuaded that Penncro would have lowered its rates in light of the bargaining power that Penncro, unlike the other vendors, enjoyed as a result of the guaranteed hours provision.

Similarly, the court finds irrelevant Penncro's evidence that Sprint failed to maintain or allegedly destroyed documents concerning the poor performance of Penncro's competing vendors. Because the court concludes that Sprint guaranteed Penncro 80,625 productive hours per month, the court does not need to engage in an analysis of Penncro's performance as

whether Penncro waived Sprint's breach of its obligation.   As Penncro highlights, the MSA contains both a no-oral-modification clause and a no-oral-waiver clause.   Thus, the court first considers whether any written waivers or modifications to the agreement exist.[12]   According to Sprint, a September 26, 2002 e-mail message from Mark Botello to Hunter Croft accompanying the October 1, 2002 Addendum to Attachment A is sufficient to constitute a written "change order" pursuant to section 2.5 of the MSA or a written modification of the parties' agreement. That e-mail, in pertinent part, requires Penncro to have the requisite number of employees

_____

compared to other vendors in an effort to predict what number of productive hours Penncro would have been able to achieve over the term of the contract for purposes of measuring its damages.  To the extent the court has concluded that Penncro is not entitled to recover damages for the period leading up to Sprint's breach, that conclusion is not based on any comparative performance of other vendors but is based solely on the course of conduct between Penncro and Sprint and the parties' mutual waiver of their respective rights to demand full performance from the other party during the early stages of the contract.  Thus, the court sustains Sprint's continuing objection on relevance grounds to Penncro's evidence at trial concerning this issue.

[12]Modification of the guaranteed hours provision was expressly permitted in Attachment A, which permitted Sprint to reduce the number of guaranteed hours "[i]n the event that Supplier is in 3rd place for 3 months or more consecutively, or scores below 100 points for 3 consecutive months" in the competitive evaluation process.  While Sprint does not contend that this provision was ever satisfied or that it ever attempted to reduce the hours pursuant to this provision, Sprint's expert offered an alternative damages calculation that requires the court to assume that Sprint would have reduced Penncro's hours pursuant to this provision at some point during the term of the contract in light of Penncro's poor performance.  Penncro objected to this testimony on grounds of relevance and the court retained the objection under advisement.  Regardless of the formal basis of Penncro's objection, the court cannot consider Sprint's alternative measure of damages because Sprint did not preserve this particular defense to damages in the pretrial order and, thus, it has been waived.  Moreover, even if the court were to consider the testimony concerning an alternative measure of damages, the court is simply not persuaded that Penncro's performance over the term of the contract would have supported a reduction of hours pursuant to this provision and, thus, the court would reject the alternative measure in any event.

available for calls that Sprint has forecasted will be needed for each half-hour increment.  Even assuming this were a valid change order or modification to the parties' agreement,[13] the e-mail simply does not change or even address the nature of Sprint's obligation to pay for 80,625 productive hours per month.  In his e-mail, Mr. Botello was simply urging Penncro to step up to the plate and provide more productive hours by staffing to Sprint's forecasts.  In short, nothing in Mr. Botello's e-mail modified Sprint's obligation as set forth in section C of the Contract Order.

The evidence does not reveal any other possible written waivers or modifications to section C of the Contract Order.[14]   While Penncro argues that the no-oral-modification-or-waiver clauses are fatal to any further argument concerning modification or waiver, "it is well settled in Kansas that 'the terms of a written contract may be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether such subsequently executed contract be in writing or in parol.'"  *See Car-X Serv. Systems, Inc. v. Kidd-Heller*, 927 F.2d 511, 518 (10th Cir. 1991) (citing Kansas cases).   "This is true even when the written contract contains a provision purporting to require that subsequent modifications be evidenced by a writing."  *Id*. (citing Kansas cases); 8 *Corbin on Contracts* § 40.13 at 571 ("At common law, an express provision in a written contract that no rescission or variation is valid unless it too is in writing will not invalidate a subsequent

---

[13]By its terms, section 2.5 of the MSA permits Sprint to propose "changes to Services and Deliverables provided by Supplier under a particular Contract Order by giving a change notice to Supplier."  The section does not contemplate changes to Sprint's obligations under a particular Contract Order.

[14]As noted earlier, to the extent Sprint's unilateral removal of the word "guaranteed" in the October 1, 2002 Addendum to Attachment A could be deemed a modification, Sprint never argued at any time during the course of the litigation that this act constituted a modification of the parties' agreement.

oral agreement to the contrary."); Farnsworth, *supra*, § 7.6 at 493 (same).

Kansas law also permits parties to waive or modify through their conduct a provision requiring that any modifications be in writing.  *Saddlewood Downs, L.L.C. v. Holland Corp*., 33 Kan. App. 2d 185, 194 (2004) (provision in construction contract that modifications must be in writing can be avoided by the parties "when their words, acts, or conduct amount to a waiver, modification, rescission, abrogation, or abandonment of the provision"); *Owens v. City of Bartlett, Labette County, Kansas*, 215 Kan. 840, 843 (1974) (stipulation in construction contract that modifications must be in writing can be avoided by the parties where "their words, acts, or conduct would amount to a waiver or modification of such provision").   Typically, courts will find that parties have waived or modified a provision requiring written modifications when the parties have repeatedly disregarded the provision.  *See Saddlewood Downs*, 33 Kan. App. 2d at 195 (pattern of disregarding written authorization is a factor in determining whether parties modified or waived provision); *Owens*, 251 Kan. at 845 (where parties repeatedly disregarded the no-oral-modification clause and contractor routinely submitted itemized statements for extras which City paid, clause had been waived or modified). The written waiver and written modification clauses of the MSA, then, will not preclude a finding of waiver or modification in this case if the parties routinely waived their rights under the Contract Order or made modifications to the terms of Contract Order without regard to the clauses requiring that waivers or changes be made in writing.

Here, Sprint contends that, to the extent the Contract Order obligated Sprint to pay Penncro for 80,625 productive hours per month,  Penncro acquiesced to a course of performance under

26

the contract in which Sprint paid Penncro for only those productive hours actually provided by Penncro.   *See* Pretrial Order § 7.a.4 (Penncro "waived any complaint about reduction in hours before February 2003"); *see also* Sprint's Proposed Findings of Fact ¶ 15 ("Penncro's failure to invoice Sprint for 80,625 hours per month before termination reflects, at the very least, a mutual understanding by the parties that Sprint's obligation would be limited to paying Penncro for the productive hours it delivered and for which it billed, and a waiver on Penncro's part of any contractual entitlement to be paid for 80,625 hours per month regardless of how many hours it actually provided."); Sprint's Conclusions of Law ¶ 22 ("Penncro waived its right to seek damages for productive hours not worked, invoiced, or paid.").   The burden is on Sprint to demonstrate a waiver or modification of the terms of the Contract Order.  *See Alexander v. Wehkamp*, 171 Kan. 285, 289-90 (1951) (burden of proof lies with party arguing that written contract was subsequently modified); *Zenda Grain & Supply Co. v. Farmland Indus., Inc.*, 20 Kan. App. 2d 728, 745-46 (1995) (argument that party waived its right to recover by continuing contract after knowledge of breaches is a defense).

Waiver by acceptance of a course of performance is provided for in comment (g) to Restatement (Second) of Contracts § 202, which states that "[w]here it is unreasonable to interpret the contract in accordance with the course of performance, the conduct of the parties may be evidence of an agreed modification or of a waiver by one party."  While the court has not found any Kansas cases discussing comment (g) to this section of the Restatement, Kansas courts have recognized that one party to a contract may waive the other party's breach of its obligation.  *See, e.g., Concrete Accessories Co. v. Moses*, 32 Kan. App. 2d 1120, 1126-27 (2004) (landlord waived

27

his right to challenge tenant's failure to give proper notice under renewal clause where landlord accepted substantial performance of renewal option); *Zenda Grain & Supply Co.*, 20 Kan. App. 2d at 746 ("Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right.").

As noted in the factual findings, from May 2002 through the termination of the Contract Order in January 2003, Penncro billed Sprint each month only for those productive hours that it actually provided to Sprint in the previous month.  At no time did Penncro bill Sprint for 80,625 productive hours and Penncro never complained that Sprint did not pay Penncro for 80,625 productive hours.  As explained by Mr. Crowley, Penncro did not bill Sprint for 80,625 hours or complain about Sprint's failure to pay for the guaranteed number of hours because the parties were in the early stages of the contract, he did not want to "cause a problem" with the project and he fully expected Sprint to meet its obligation over the course of the three-year contract.  Similarly, from May 2002 through the termination of the Contract Order in January 2003, Sprint paid Penncro's invoices each month without objection despite the fact that Penncro was not fulfilling its obligation under the Contract Order to provide 80,625 productive hours each month or, at a minimum, to keep its staffing level sufficient to be able to provide that number of productive hours.

The Kansas Supreme Court analyzed analogous facts in *Crestview Bowl, Inc. v. Womer Construction Co.*, 225 Kan. 335 (1979).  In that case, two parties–Crestview Bowl as tenant and Womer Construction as landlord–entered into a written real estate lease.  *Id*. at 336.  The lease

was executed in 1961 and provided for a base ten-year period with an option to extend for two additional ten-year periods. *Id.* at 336-37. Under the terms of the lease, Crestview Bowl was required to pay monthly rent and, beginning in 1967, any increase in property taxes. *Id*. In June 1971, Crestview Bowl exercised its option to extend the lease for another ten years. *Id*. at 338. From 1967 through 1974, Crestview Bowl never paid any tax increase and Womer Construction "chose to remain silent as to the tax increase clause," in part because Womer Construction knew that Crestview Bowl was experiencing financial difficulties and was unable to make the additional tax payments. *Id*. at 338, 339. Womer Construction never advised Crestview Bowl that taxes had increased and never advised Crestview Bowl that additional money was due under the terms of the lease even though it knew that Crestview Bowl had not paid the tax increases. *Id.* at 338.

In December 1974, Womer Construction, for the first time, sought to recover tax liability due since 1967. *Id.* Crestview Bowl filed a declaratory judgment action concerning the parties' rights and obligations under the lease. *Id*. at 336. The Kansas Supreme Court held that Womer Construction had waived its right to tax increase payments though the year 1974, but that Crestview Bowl was liable for tax increases commencing with the year 1975. *Id*. at 341. In concluding that Womer Construction had waived the payments prior to 1975, the Kansas Supreme Court emphasized that Womer Construction, each month, had accepted rental payments without any request for additional payments for the tax increases despite its knowledge that additional money was owed. *Id*.

Applying *Crestview Bowl* to the facts of this case, the court readily concludes that each party waived the other party's breach in the months prior to Sprint's termination of the contract.

Penncro, despite knowing that it was entitled to payment for a guaranteed number of productive hours, did not object when Sprint failed to make such payments. Rather, Penncro simply continued to bill Sprint for only those hours provided by Penncro and continued its efforts to fulfill its own obligations under the contract–maintaining staffing levels sufficient to provide 80,625 productive hours should it be called upon by Sprint to do so. Sprint, in turn, knew that Penncro was obligated to maintain staffing levels sufficient to provide 80,625 productive hours and knew that Penncro was not fulfilling this obligation in any month prior to the termination of the contract. Despite this knowledge, Sprint chose to remain silent and to compromise with Penncro, on a month-to-month basis, to reach a productive hour requirement that Sprint's call volume necessitated and that Penncro's staffing level could handle.

The parties' course of performance in the early stages of the contract, then, does not suggest that the contract, in fact, did not require Sprint to pay for a guaranteed number of hours; rather, the parties' course of performance simply reflects the reality faced by both parties in the early months of the contract. Neither party was able to offer the other party full performance. Penncro could not maintain staffing levels sufficient to handle 80,625 productive hours and Sprint did not have the call volume sufficient to necessitate 80,625 productive hours from Penncro even if Penncro had been able to provide it. Because each party realized that it had little room to complain about the other's performance in the early stages, and because both parties hoped and fully intended to achieve full performance each month over the course of the contract, the parties tacitly agreed to ignore each other's deficiencies while the parties worked together to achieve mutual full performance.

However, precisely because both parties intended to achieve full performance under the contract, neither party intended to modify or alter on a permanent basis the other party's obligations under the Contract Order. Indeed, the parties' course of performance during the early months of the contract is best explained by Mr. Crowley, who testified that despite his knowledge that Penncro was entitled to payment for a guaranteed number of hours, Penncro remained silent on that issue because the parties were in the early stages of the contract, Penncro did not want to cause problems in its working relationship with Sprint, and Penncro expected Sprint to achieve full performance over the course of the contract. Clearly, then, no modification of the parties' obligations was intended. Moreover, the parties' mutual waiver of the other's obligations occurred on a month-to-month basis, a conclusion that is not only supported by the facts but in line with section 17.7 of the MSA, which states that the "waiver of a breach of any term or condition of this Agreement will not constitute the waiver of any other breach of the same or any other term."

With respect to Penncro's claim for damages, then, Penncro has waived its right to recover damages for the months from May 2002 through January 2003. For the period from February 2003 through May 2005, the loss in value to Penncro of Sprint's performance caused by Sprint's breach is $53,109,386.00. The court's calculation is based on the methodology used by Vincent Thomas, plaintiff's expert, as specifically detailed in Plaintiff's Exhibit 256–a methodology to which Sprint had no objection aside from Mr. Thomas's assumption that Penncro was entitled to payment for 80,625 productive hours each month. Because the court concludes that Penncro, consistent with Mr. Thomas's assumption, was entitled to payment for 80,625 productive hours per month under the unambiguous terms of the Contract Order, the court concludes that Mr.

Thomas's methodology is appropriate.

B.      *Cost Avoided*

In measuring Penncro's damages, it is appropriate to deduct "any cost . . . that [the injured party] has avoided by not having to perform." *See Restatement (Second) of Contracts* § 347(c); *see also* E. Allan Farnsworth, *Contracts* § 8.22 at 667 (2d ed. 1990) ("In calculating damages, a court will take into account any cost the injured party has avoided as a result of not having to render any further performance."). While it has not used the phrase "cost avoided," Kansas has certainly recognized this principle. *See Lisbon v. Heatcraft, Inc.*, 23 Kan. App. 2d 374, 378-79 (1997) (in breach of contract action, jury was instructed that measure of damages for terminated sales representative was amount of commissions substitute sales representative earned during remainder of contract period less any costs that the terminated sales representative would have incurred in securing the sales).

In determining whether Penncro avoided any cost by not having to render further performance, the court first considers which party bears the burden of proof on this issue. The courts that have addressed this issue seem to agree that the burden properly lies with the breaching party. *See Katz Communications, Inc. v. Evening News Ass'n*, 705 F.2d 20, 26 (2d Cir. 1983) (burden on breaching party to prove damages should be diminished by the amount of salaries, wages, and other overhead or indirect or fixed costs)*; United States v. Merritt-Meridian Construction Corp.*, 2000 WL 272177, at *1-2 (S.D.N.Y. Mar. 10, 2000) (burden of proving "costs avoided" under Restatement (Second) of Contracts § 347 was properly placed on the

32

breaching party; the party "seeking to take advantage" of the costs avoided should bear the burden of proving those costs).  The court concludes that Sprint should bear the burden of proof on this issue but, as will be explained, would come to the same results as to the specific costs avoided by Penncro regardless of which party bears the burden of proof.

The court begins with the operating expenses that Penncro did not incur as a result of Sprint's breach.  Both parties agree that operating expenses should be deducted from Penncro's recovery and, in fact, the parties' calculations of the operating expenses that Penncro would have incurred but for the breach are very close.  Mr. Thomas concludes that Penncro would have incurred operating expenses in the amount of 6.3% of the revenues that Penncro would have earned from the contract; Mr. Finch, Sprint's expert, concludes that Penncro would have incurred operating expenses in the amount of 5.4% of revenues that Penncro would have earned from the contract.  The difference between the two calculations lies with the particular financial statements used by the parties–Mr. Thomas relied on the financial statements from 2004 and 2005 while Mr. Finch used the financial statements from 2002.[15]   The court concludes that Mr. Thomas's calculation of 6.3% is more appropriate in light of the testimony of Mr. LaSala, Penncro's chief financial officer, that the financial statements from 2002 for the McAllen facility were not accurate for a variety of reasons.  Indeed, Mr. Thomas testified that he relied primarily on the financial statement from 2004 and 2005 in calculating operating expenses because he believed he could achieve a more precise calculation using those statements.   The court, then, will calculate

_____

[15]Neither expert was provided financial statements from 2003 and, as explained by Mr. LaSala, financial statements were not prepared for the McAllen facility in 2003.

operating expenses as 6.3% of the revenues Penncro would have earned from the contract but for the breach.

The parties also agree that personnel or payroll expenses should be deducted from Penncro's recovery. Mr. Finch calculates that Penncro would have incurred payroll expenses in the amount of 55% of the revenues Penncro would have earned from the contract. While Mr. Thomas does not calculate the payroll expenses as a percentage of revenue and uses a different methodology to arrive at his conclusion, his ultimate calculation of payroll expenses constitutes approximately 43% of the revenues Penncro would have earned from the contract. One of the primary differences between the two calculations is that Mr. Finch includes "spread overhead" as an element of payroll expense to be deducted. Indeed, Penncro's general ledger detail for the McAllen facility contained a separate line item for "spread overhead"[16] as an element of payroll expense. Mr. Thomas, in contrast, did not factor spread overhead into his payroll expense calculation.

The court readily concludes that Penncro's spread overhead should not be considered as a cost of Penncro's performance to be deducted from the gross proceeds of the contract in

---

[16]The evidence at trial demonstrated that this phrase appears as "spred overhead" in certain places on the general ledger detail and as "spread overhead" in other places. Mr. Finch testified that he had no knowledge of what "spred" overhead might be and that Penncro must have included this expense on the McAllen ledger for a particular reason. However, "spread" overhead, as demonstrated at trial, is a phrase that is recognized in the accounting context and is used to explain the practice of spreading corporate overhead at a divisional level or, in this case, assigning a portion of corporate overhead to each of Penncro's facilities. Thus, the court believes that the use of the word "spred" was simply a misspelling of "spread" and that "spread overhead" was the intended entry.

determining Penncro's damages.  In so concluding, the court is persuaded by the reasoning of the

Third Circuit in *Vitex Manufacturing Corp. v. Caribtex Corp.*, 377 F.2d 795 (3rd Cir. 1967):

> Although there is authority to the contrary, we feel that the better view is that normally, in a claim for lost profits, overhead should be treated as a part of gross profits and recoverable as damages, and should not be considered as part of the seller's costs. A number of cases hold that since overhead expenses are not affected by the performance of the particular contract, there should be no need to deduct them in computing lost profits.  The theory of these cases is that the seller is entitled to recover losses incurred and gains prevented in excess of savings made possible; since overhead is fixed and nonperformance of the contract produced no overhead cost savings, no deduction from profits should result.

*Id.* at 798 (citations omitted).  Mr. Finch testified that the spread overhead should be deducted

because, given the magnitude of the Sprint contract in terms of Penncro's revenues, "everything

is a variable cost."  The court disagrees.  There is simply no evidence–only Mr. Finch's conclusory

statement–that Penncro's overhead was attributable to or affected by the Sprint contract.  Indeed,

Penncro's overhead would have remained the same whether or not Penncro and Sprint entered into

the Contract Order and whether or not Penncro provided services to Sprint.  Since this overhead

remained constant, it would be improper to consider it as a cost of Penncro's performance which

it saved by virtue of not having to perform and therefore to be deducted from the gross proceeds

of the Sprint contract.  *See id.*

Mr. Finch also urges that spread overhead should be deducted because it appeared as a

separate line item in Penncro's general ledger detail for the McAllen facility and, surely, Penncro

entered the specific figures on the ledger detail for a reason.  The particular dollar amounts

assigned to McAllen for spread overhead, however, appear to be arbitrary and not inconsistent with

modern accounting principles.  As explained by the Third Circuit:

> [B]ecause it is useful for planning purposes to allocate a portion of overhead to each transaction, it does not follow that this allocate share of fixed overhead should be considered a cost factor in the computation of lost profits on individual transactions. . . .
>
> [I]t must be recognized that the pro rata allocation of overhead costs is only an analytical construct.  In a similar manner one could allocate a pro rata share of the company's advertising cost, taxes and/or charitable gifts. The point is that while these items all are paid from the proceeds of the business, they do not normally bear such a direct relationship to any individual transaction to be considered a cost in ascertaining lost profits.

*Id*. at 799.  Again, the court is persuaded by the court's reasoning in *Vitex* and concludes that it is not appropriate to deduct this fixed cost in calculating Penncro's damages.  *See Jetz Serv. Co. v. Salina Properties*, 19 Kan. App. 144, 153 (1993) ("Fixed expenses or overhead are the continuous expenses of the business, irrespective of the outlay on a particular contract . . . [and] are not deducted when computing lost profits.").

Mr. Finch testified that his payroll expense calculation would be about 7% lower if he did not factor spread overhead into the calculation.  In other words, once spread overhead is removed from the calculation, Mr. Finch calculates that Penncro would have incurred payroll expenses in the amount of 48% (7% lower than his initial calculation of 55%) of the revenues Penncro would have earned from the contract, bringing him closer to Mr. Thomas's calculation of 43% of revenues.  Another difference between the two calculations is that Mr. Thomas essentially calculates Penncro's payroll expense per productive hour paid by Sprint.  That is, Penncro received $22.00 from Sprint per productive hour and, according to Mr. Thomas, $9.10 of that $22.00 was spent by Penncro in personnel costs.  Mr. Thomas's calculation, then, does not reflect what Penncro actually paid its employees (*i.e.*, for all time that an employee was "on the clock,"

including breaks) but reflects only "productive" time spent by its employees (*i.e.*, available time, talk time, hold time and wrap-up time) spent by a Penncro employee.   In contrast, Mr. Finch's payroll expense calculation captures the hours that Penncro's employees actually worked as opposed to only those hours for which Sprint paid Penncro.   The court easily concludes that Mr. Finch's approach on this issue is sound and accurately reflects the actual cost avoided by Penncro.

According to Mr. Finch, Mr. Thomas's payroll expense calculation would be 2% to 4% higher if it had reflected the actual hours worked by Penncro employees which would bring Mr. Thomas's payroll expense calculation to 45% to 47% (within a few percentage points of Mr. Finch's calculation of 48%) of the revenues Penncro would have earned from the Sprint contract. The only remaining difference of any significance between the calculations of the parties is that Mr. Finch's calculation reflects salaries paid to the site director of the McAllen facility as well as additional human resources personnel and IT support personnel employed at the McAllen facility.   Mr. Thomas did not include these salaries based on his opinion that those employees would be employed at the facility regardless of whether Sprint terminated the contract and, thus, the salaries were akin to fixed costs.   The court is persuaded that the salary paid by Penncro for a McAllen site director is a fixed cost such that it is not appropriate to include that salary in a payroll expense calculation, but that additional human resources and IT support personnel were required in light of the magnitude of the Sprint contract such that Penncro would have incurred additional costs (by having to maintain additional administrative support staff) if it had continued to perform the Sprint contract and if it had been providing 80,625 productive hours per month.

Ultimately, then, the court believes that a calculation for payroll expenses representing 47% of the revenues Penncro would have received from the contract is an accurate estimation of the costs Penncro would have incurred.

Finally, Sprint contends that the court should deduct as a cost of Penncro's performance compensation that Penncro paid to its officers because, according to Sprint's expert, the compensation varied directly with the revenue from the Sprint contract; that is, the compensation paid to officers increased as revenues from the Sprint contract increased. Mr. Finch's observation, however, simply reflects the nature of Penncro's status as a Subchapter S corporation. Subchapter S corporations do not retain profits or losses but pass them to their shareholders every year. *Capital Video Corp. v. C.I.R.*, 311 F.3d 458, 466-67 (1st Cir. 2002).[17] The loss of the Sprint contract, then, would have negatively affected Penncro's profits which, in turn, negatively affected the compensation of the shareholders as a result of the pass-through nature of S corporation status. *See Cabintaxi Corp. v. C.I.R.*, 63 F.3d 614, 615 (7th Cir. 1995) (Subchapter S corporation's losses flow through to shareholders). Thus, contrary to Mr. Finch's testimony, Penncro will not receive a windfall if it recovers lost profits without a deduction for amounts it would have paid in increased officer compensation because the increased compensation would have flowed directly from the profits themselves, not as an additional cost incurred by Penncro. The court, then, declines to deduct officer compensation as a cost of Penncro's performance.

In sum, then, Penncro has saved operating expenses of $3,345,891.00 (or, 6.3% of

---

[17]No evidence was presented that any contracts, agreements or board resolutions existed which expressly tied officer compensation to revenues earned from the Sprint contract.

$53,109,386.00) by not having to perform its obligations under the Contract Order and Penncro has saved payroll expenses of $24,961,411.00 (or, 47% of $53,109,386.00) by not having to perform its obligations under the Contract Order.   The court will deduct from the loss in value sustained by Penncro a total of $28,307,302.00 as cost avoided by not having to perform.


C.      *Loss Avoided*

        In measuring Penncro's damages, it is also appropriate to deduct "any loss that [the injured party] has avoided by not having to perform."   *See Restatement (Second) of Contracts* § 347(c); *see also* E. Allan Farnsworth, *Contracts* § 8.22 at 667 (2d ed. 1990) ("In calculating damages, a court will take into account . . .   any loss [the injured party] has avoided by reallocating any resources that were salvageable.").   Kansas courts have recognized this principle.   *See Jetz Serv. Co. v. Salina Properties*, 19 Kan. App. 144, 149 (1993) ("[G]ains which were . . . received by the nondefaulting party by entering into another contract or transaction should be used in reducing damages caused by a breach of contract promise only where the breach gave rise to the opportunity to enter into those contracts or transactions.") (quotation omitted) (applying "lost volume" rule to provider of services outside UCC context); *Wichita Fed. Sav. & Loan Ass'n v. Black*, 245 Kan. 523, 540-41 (1989) ("[W]here the defendant's . . . breach of contract causes damages, but also operates directly to confer some benefit upon the plaintiff, the plaintiff's claim for damages may be diminished by the amount of the benefit received.") (quoting *Macon-Bibb, Etc. v. Tuttle/White Constructors, Inc.*, 530 F. Supp. 1048, 1055 (M.D. Ga. 1981)), *superseded by statute on other grounds as recognized in Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 362-63 (1995).

While there is very little authority addressing the issue of which party bears the burden of proof on whether Penncro has avoided any losses as a result of Sprint's breach, the parties in this case have agreed that the issue is akin to an offset against Penncro's damages such that the burden of proof lies with Sprint.  *See Wichita Fed. Sav. & Loan Ass'n*, 245 Kan. at 541 (referring to the concept of loss avoided as an "offset theory").[18]  The Third Circuit has held that the breaching party in the lost volume seller context has the burden of proving both actual mitigation and potential mitigation.  *See Storage Tech. Corp. v. Trust Co. of New Jersey*, 842 F.2d 54, 57 (3rd Cir. 1988). The Restatement also suggests that the burden of proof is on the breaching party to establish in the lost volume seller context that the other party would not have undertaken the subsequent transaction but for the breach.  *See Restatement (Second) of Contracts* § 347, cmt. f, illus. 16. Other authorities have recognized the broader principle that the breaching party has the burden of proving successful mitigation efforts.  *See Hodge v. Evans Fin. Corp.*, 823 F.2d 559, 569 (D.C. Cir. 1987) (employer bears the burden of proving that terminated employee obtained a substitute job and is therefore chargeable with the income he obtained); 3 Dan B. Dobbs, *Law of Remedies* § 12.6 at 128 (2d ed. 1993) (defendant bears burden of establishing that it is entitled "to claim a credit for any actual gains the plaintiff receives in transactions that are substituted for the contract breached by the defendant").

The court is convinced that the burden of proof is on Sprint to establish that Penncro has avoided loss.   Ultimately, however, this conclusion has little consequence because, regardless of

---

[18]Sprint identifies the loss avoided issue as an affirmative defense in the pretrial order.

which party bears the burden, the court is persuaded by Sprint's evidence, as explained in the factual findings, that Penncro would not have been able to perform the Sprint third-party contract, the AT&T outbound collections work or any other collections work but for the termination of the Sprint first-party inbound contract. Thus, the court deducts from Penncro's lost gross revenues the amount of $1,145,250.00, which is the net incremental income Penncro realized on the Sprint third-party contract. Similarly, the court deducts from Penncro's lost gross revenues the amount of $6,520,222.00, which is the net incremental income Penncro realized on the AT&T work and other collections work at the McAllen facility during the term of the Contract Order. In total, then, the court will deduct $7,665,472.00 as loss avoided by Penncro.

D.    *Prejudgment Interest*

Prejudgment interest in a diversity action is a substantive matter governed by state law. *Hofer v. Unum Life Ins. Co. of Am.*, 441 F.3d 872, 878 (10th Cir. 2006) (citing *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1134 (10th Cir. 2002)). In Kansas, prejudgment interest is governed by K.S.A. § 16-201. *Id.* (citing *Miller v. Botwin*, 258 Kan. 108, 899 P.2d 1004, 1011 (1995)). That statute provides:

> Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from

and after the end of each month, unless paid within fifteen days thereafter.

*Id*. at 878-79 (quoting Kan. Stat. Ann. § 16-201).   In essence, prejudgment interest is allowed on "liquidated" claims and a claim becomes liquidated "when both the amount due and the date on which it is due are fixed and certain, or when the same become definitely ascertainable by mathematical computation."   *Id.* at 880 (quoting *Green Constr. Co. v. Kansas Power & Light Co.*, 1 F.3d 1005, 1010 (10th Cir. 1993) (quoting *Plains Res., Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653, 657 (1984))).

The court concludes that prejudgment interest is not appropriate in this case because Penncro's damages were not liquidated.   Significantly, the court was required to find facts and make calculations concerning whether Penncro, as a result of Sprint's breach, had avoided any costs that it would have incurred had Sprint not breached the Contract Order.   In such circumstances, the court cannot conclude that the amount due was liquidated.   *See Lisbon v. Heatcraft, Inc.*, 23 Kan. App. 2d 374, 378-79 (1997) (where jury was instructed that measure of damages for terminated sales representative was amount of commissions substitute sales representative earned during remainder of contract period less any costs that the terminated sales representative would have incurred in securing the sales, damages not liquidated until jury decided if any costs existed which would be deducted from commissions); *see also Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 774 (10th Cir. 2004) (interpreting similar Oklahoma statute to preclude an award of prejudgment interest "when a factual finding must be made to determine the precise amount of damages"); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 33 Kan. App. 2d 504, 516 (2005) ("When the amount of damages is not finally

determined until the jury makes the requisite factual determination, prejudgment interest cannot be awarded.").

The court may, in its discretion, award prejudgment interest "on an unliquidated claim when a party has had use of the money, the opposing party has been deprived of that use, and the order is necessary to award full compensation." *See Kansas Baptist Convention v. Mesa Operating Ltd. Partnership*, 258 Kan. 226, 242 (1995). In this case, the court does not believe that prejudgment interest must be awarded to achieve full compensation. In fact, the court believes that its award of damages more than adequately compensates Penncro for Sprint's breach of the Contract Order.

For the foregoing reasons, the court declines to award prejudgment interest in this case.[19]

E.    *Attorneys' fees*

The final issue before the court is Penncro's request for attorney's fees pursuant to section 16.5 of the MSA, which provides that the "prevailing party" in any formal dispute will be entitled to "reasonable attorney's fees and costs, including reasonable expert fees and costs." The court assumes at this juncture that Sprint does not dispute Penncro's entitlement to fees under this

---

[19]Prior to trial, Sprint filed a motion in limine seeking to preclude Penncro from presenting any evidence relating to Penncro's entitlement to prejudgment interest. In large part, the court denied the motion. The court, however, granted the motion to the extent Penncro asserted that the court should award prejudgment interest based solely on the alleged vexatiousness of Sprint's conduct. In brief, the court concluded that Sprint's conduct, as alleged by Penncro, simply did not rise to the level of vexatiousness. The court, then, need not address that issue here.

section.[20]   Although Local Rule 54.2 applies by its terms to  statutory attorneys' fees, Penncro is

directed to comply with the procedures set forth in Local Rule 54.2, including the provision for

consultation between the parties, to facilitate an award of fees to Penncro.  *See* D. Kan. R. 54.2.

III.    **Summary of Calculation of Damages**

Based on the foregoing findings of fact and conclusions of law, the court awards Penncro

damages in the amount of $17,136,612.00.   This figure represents Penncro's lost contractual

revenues of $53,109,386.00; less $28,307,302.00 in cost avoided by Penncro by not having to

perform; less $7,665,472.00 in loss avoided by Penncro.

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment be entered in favor

of plaintiff Penncro Associates, Inc. against defendant Sprint Spectrum L.P. d/b/a Sprint PCS in

the amount of $17,136,612.00 on its claim for breach of contract.

**IT IS SO ORDERED.**

---

[20]The MSA also provides that if the prevailing party "rejected a written settlement offer that exceeds its recovery, the offering party will be entitled to its reasonable attorney's fees and costs."  In the pretrial order, Sprint has preserved a claim for attorney's fees under this provision of section 16.5.  While it is not clear from the record whether it would be entitled to pursue fees under this provision in light of Penncro's recovery, the court's discussion of the procedure that Penncro should follow to recover its fees is not intended to foreclose Sprint from pursuing its fees under this provision if the facts support it.

Dated this 15th day of May, 2006, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge