IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**Penncro Associates, Inc.,**

   **Plaintiff,**

v.                  Case No. 04-2549-JWL

**Sprint Spectrum L.P. d/b/a Sprint PCS,**

   **Defendant.**

## MEMORANDUM & ORDER

  Plaintiff Penncro Associates, Inc. ("Penncro") filed this suit against Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint") alleging that Sprint breached a contract between the parties under which plaintiff was to provide first-party inbound collections services for Sprint and seeking damages for the breach. On the parties' motions for summary judgment, the court concluded that Sprint's termination of its contract with Penncro was in breach of the contract's terms and entered summary judgment in favor of Penncro on the issue of Sprint's liability.

  Over the course of three days in April 2006, a trial to the court was held on the issue of Penncro's claims for damages for direct economic loss and prejudgment interest. In May 2006, the court issued its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), awarding Penncro damages for direct economic loss in the amount of $17,136,612.00 and declining to award prejudgment interest. This matter is presently before the court on Penncro's motion for amendment of judgment and for partial reconsideration pursuant to Federal Rules of Civil Procedure 52(b) and 59(e) (doc. 165). As explained below, the motion is granted in part and denied in part.

## I.     Relevant Background

The court, in writing this memorandum and order, assumes familiarity with its summary judgment ruling and its findings of fact and conclusions of law, which together set forth in detail the facts of this case. Only a small subset of those facts is pertinent to Penncro's motion to amend the judgment and the court summarizes those facts here for the reader's convenience.

After Sprint terminated the Contract Order, Penncro obtained a third-party outbound collections contract with AT&T. In its findings of fact, the court specifically found that Mr. Griffin, at the time he solicited the AT&T work, proposed to AT&T that Penncro would perform the AT&T contract at the McAllen facility because that facility had experienced collectors working on the Sprint contract who could do AT&T's work seamlessly in light of that experience. Penncro was awarded the AT&T work in February 2003 and, as suggested by Mr. Griffin at the time he solicited the work, performed the AT&T work at the McAllen facility. The court found that Penncro would not have been able to perform the AT&T work but for the termination of the Sprint first-party inbound contract. In so finding, the court explained that the significant staffing problems faced by Penncro at the McAllen facility would have precluded Penncro from handling the AT&T work at that facility at a time when it was also handling the Sprint contract. The court also found, based on the undisputed testimony of Sprint's expert, Charles Finch, that Penncro realized an incremental net profit of $6,520,222.00 from the AT&T[1] outbound work and, thus,

---

[1]The court's findings of fact and conclusions of law contain an error in this respect that Penncro asks the court to correct. Specifically, the court, in its factual findings, stated that "Penncro realized an incremental net profit of $6,520,222.00 from the *Sprint* outbound work." (emphasis added). What the court intended to state was that Penncro realized an incremental

2

deducted this amount from Penncro's lost gross revenues as loss avoided. *See Restatement (Second) of Contracts* § 347(c); *see also* E. Allan Farnsworth, *Contracts* § 8.22 at 667 (2d ed. 1990) ("In calculating damages, a court will take into account . . . any loss [the injured party] has avoided by reallocating any resources that were salvageable."); *Jetz Serv. Co. v. Salina Properties*, 19 Kan. App. 144, 149 (1993); *Wichita Fed. Sav. & Loan Ass'n v. Black*, 245 Kan. 523, 540-41 (1989).

## II.     Penncro's Motion to Amend the Judgment

In its motion to amend the judgment, Penncro first contends that the court's ruling with respect to the AT&T contract is erroneous because it is based on the "unsupported assumption" that the McAllen facility was the only facility at which the AT&T work could have been performed. According to Penncro, Sprint failed to prove that Penncro was required to perform the AT&T work at McAllen and failed to prove that Penncro could not have performed the AT&T work at a facility other than the McAllen facility or contracted with another vendor for additional capacity. Penncro also contends that the court's finding that Penncro could not have performed any other collections work at McAllen but for the termination of the Sprint contract is erroneous because Sprint failed to adduce any evidence that Penncro could not have performed these other contracts at facilities other than McAllen or could not have leased additional capacity from another vendor to perform

---

net profit of $6,520,222.00 from the AT&T outbound work," which, as will be explained below, is also not accurate. The correct statement is that Penncro realized an incremental net profit of $6,520,222.00 from the AT&T outbound work and the American Water work. The court, then, corrects the order and, to that limited extent, Penncro's motion is granted.

this work. Finally, Penncro contends that the court erred in deducting $6.5 million because Sprint failed to provide any evidentiary basis for the court to do so. Specifically, Penncro contends that Sprint failed to set forth any evidence which would permit the court to determine how much of the $6.5 million incremental profit was allocable to the AT&T contract as opposed to the other collections work performed by Penncro at McAllen after the termination of the Sprint contract. As explained below, the court rejects Penncro's arguments.

*A.    Applicable Standard*

Rule 52(b) provides that a district court may, upon motion by a party, amend its findings or make additional findings and may amend the judgment accordingly. Fed. R. Civ. P. 52(b). The primary purpose of Rule 52(b) is to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and judgment entered thereon. *Myers v. Dolgencorp, Inc.*, 2006 WL 839458, at *1 (D. Kan. Mar. 25, 2006) (citing 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2582 (2d ed. 1995)). A motion made pursuant to Rule 52(b) will only be granted when the moving party can show either manifest errors of law or fact, or newly discovered evidence; it is not an opportunity for parties to relitigate old issues or to advance new theories. *Id*. (citing Wright & Miller, *supra*, § 2582). A motion under Rule 52(b) may be made in conjunction with a Rule 59 motion. Fed. R. Civ. P. 52(b).

Grounds warranting a motion to alter or amend pursuant to Rule 59(e) include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need

4

to correct clear error or prevent manifest injustice." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (citing *Brumark Corp. v. Samson Resources Corp.,* 57 F.3d 941, 948 (10th Cir. 1995)). Such a motion, then, is appropriate where the court has misapprehended the facts, a party's position, or the controlling law. *Id*. It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing. *Id.* (citing *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991)).

*B.     The AT&T Work and the McAllen Facility*

Penncro asserts that the court erroneously assumed that Penncro was required, contractually or otherwise, to perform the AT&T work at the McAllen facility. As will be explained, the court did not assume that the AT&T work had to be performed at McAllen and the court now states expressly what it implied in its findings of fact–that Penncro was awarded the AT&T work based on its representation that it would perform that work at the McAllen facility. In other words, Sprint's evidence at trial persuaded the court that Penncro would not have received the AT&T work but for its ability to do that work at the McAllen facility. Thus, even assuming that Penncro had the capacity to perform the work at another facility or the ability to lease additional capacity to perform the work, the evidence concerning those issues is not relevant to the court's conclusion because the court does not believe that Penncro would have been awarded the AT&T contract had it proposed doing the work anywhere other than McAllen.

In its findings of fact concerning the AT&T work, the court specifically referenced Mr. Griffin's trial testimony that at the time he solicited the work, Mr. Griffin proposed to AT&T that

5

Penncro would do the work at the McAllen facility because that facility had experienced collectors working on the Sprint contract who could do AT&T's work seamlessly in light of that experience. The court also noted that Penncro, in fact, was awarded the AT&T work and performed the AT&T contract at the McAllen facility. Missing from the court's factual findings is an express statement of what may be implied from the language of the court's order (and what the court intended to impart)–that Penncro received the AT&T contract based on its professed ability to perform that work successfully at McAllen.

Significantly, Paul Crowley testified that AT&T representatives visited the McAllen facility in November 2002 during the time frame when John Griffin was actively soliciting the AT&T work. Mr. Crowley's testimony corroborates the testimony of Mr. Griffin, who explained that during the solicitation of the AT&T work, he specifically "suggested to them that we would use our McAllen facility." The court reasonably inferred from the testimony of Mr. Crowley and Mr. Griffin that Penncro and AT&T had agreed that the AT&T collections work would be performed at McAllen if it was awarded to Penncro. Indeed, Mr. Griffin's testimony makes clear that Penncro obtained the AT&T work based on its representation that the work would be performed by experienced collectors at McAllen:

> Sprint's Counsel: When you were selling AT&T on doing collection work for them–did you tell AT&T that you've got a center in McAllen, Texas, that is full of experienced telecom collectors that could do their work pretty seamlessly because of all the experience you got with Sprint?
>
> Mr. Griffin: Yes.
>
> Sprint's Counsel: You didn't sell AT&T on the notion that we will find a place

6

>                     to do your work, did you?
>
> Mr. Griffin:           No, I did not, sir.

Based on this evidence, Sprint persuaded the court that the AT&T work was inextricably linked to the McAllen facility. Penncro's evidence concerning available capacity at other facilities and the ability to lease additional capacity from other vendors did not persuade the court to the contrary. The court thus reaffirms its conclusion that Penncro would not have been able to perform the AT&T work but for the termination of the Sprint first-party inbound contract in light of the significant problems faced by Penncro at McAllen during the time when it was handling the Sprint contract.

C.   *Other Non-Sprint Collections Work Performed at McAllen*

In addition to challenging the court's findings with respect to the AT&T work, Penncro challenges the court's finding that Penncro would not have been able to perform any other non-Sprint collections work[2] at McAllen but for the termination of the Sprint first-party inbound contract. Specifically, Penncro contends that Sprint failed to adduce any evidence that Penncro could not have performed these other contracts at facilities other than McAllen or could not have leased additional capacity from another vendor to perform this work. In a related vein, Penncro contends that the court erred in deducting $6.5 million for loss avoided because Sprint failed to

---

[2] While Penncro obtained additional collections work from Sprint after the termination of the first party contract and the court deducted from Penncro's damages the profits that Penncro earned on this contract, Penncro does not challenge this conclusion.

7

set forth any evidence which would permit the court to determine how much of the $6.5 million incremental profit was attributable to the AT&T contract as opposed to the "numerous" other contracts performed by Penncro at McAllen after the termination of the Sprint contract.

To begin, the court rejects Penncro's suggestion that it performed "numerous" other contracts and its bald assertion that AT&T represented only a "small fraction" of the collections work performed at McAllen after Sprint terminated the contract order. As the court found in its factual findings, and as the evidence reflected at trial, Penncro secured only three contracts at McAllen after Sprint terminated the contract order–it secured the Sprint third party work, the AT&T contract and a contract with American Water, a large utility company. *See* Trial Tr. at 100 (testimony of Paul Crowley). Moreover, when asked on cross-examination whether Penncro was performing work at McAllen for any clients other than Sprint prior to the termination of the contract order, Mr. Crowley responded, "I believe AT&T was down there." *See id.* at 135. In fact, AT&T was not secured until February 2003, after the termination of the contract order, and Mr. Crowley did not identify any other clients for whom Penncro performed work prior to the termination of the contract order. A reasonable inference from Mr. Crowley's testimony, then, is that Penncro was not performing any non-Sprint or non-AT&T work for any other client at McAllen prior to the termination of the Sprint first party contract. Thus, while Penncro is correct that the court improperly conflated its analysis of the AT&T work with other non-Sprint collections work, only one additional contract is at issue–the American Water contract.

With respect to that contract, Penncro is also correct that Sprint did not prove that this specific contract could not have been performed at another Penncro facility or that Penncro could

not have leased additional capacity from another vendor to perform the work.[3]  As the court held previously in its conclusions of law, the burden of proof is on Sprint to establish that Penncro has avoided loss.  The court did not, however, explore the nature and extent of Sprint's burden and welcomes the opportunity to do so now.  In doing so, the court first examines Sprint's proof at trial and then analyzes whether that proof is sufficient to meet Sprint's burden in this context.  At trial, Sprint persuaded the court that Penncro had obtained the American Water contract only after Sprint terminated the contract order with Penncro; that Penncro performed the American Water contract at the McAllen facility; that, by performing that work at McAllen, Penncro did not have to renew a lease on the Hilo or Taos facilities, did not have to spend money leasing additional space from another vendor, did not incur additional labor, training or start-up expenses as it had staff and space readily available in McAllen, and obtained a revenue stream to help offset the cost of its McAllen lease; and that Penncro would not have been able to perform the American Water contract in McAllen had it still been performing the Sprint contract.  In essence, then, Sprint persuaded the court that Penncro successfully reallocated certain resources that were salvageable after termination of the contract order and thereby avoided loss.  *See* E. Allan Farnsworth, *Contracts* § 8.22 at 667 (2d ed. 1990) ("In calculating damages, a court will take into account . .

---

[3] To the extent Sprint argues that two of Penncro's other primary facilities (Hilo and Taos) were closed in 2003 such that American Water could not be performed there, the court rejects this argument.  While Sprint is correct that Mr. Crowley testified that these facilities closed in 2003, James LaSala, Penncro's chief financial officer, testified that Mr. Crowley was incorrect with respect to his dates and that one of those facilities (Hilo) closed in 2004.  The court credits Mr. LaSala's testimony on this issue.  Moreover, while Sprint argues that Penncro's Southhampton facility only had 50 available seats, Sprint did not prove that 50 seats was inadequate for the American Water contract.

. any loss [the injured party] has avoided by reallocating any resources that were salvageable."). Stated another way, Sprint has convinced the court that its breach gave rise to the opportunity for Penncro to perform American Water work at McAllen and thereby conferred a benefit on Penncro. *See Wichita Fed. Sav. & Loan Ass'n v. Black*, 245 Kan. 523, 540-41 (1989) ("[W]here the defendant's . . . breach of contract causes damages, but also operates directly to confer some benefit upon the plaintiff, the plaintiff's claim for damages may be diminished by the amount of the benefit received.").

The court is also satisfied that Sprint's showing is sufficient to meet its burden of proof that it is entitled to a reduction in Penncro's damages. In its motion, Penncro urges that Sprint had the burden of proving that Penncro could not have performed the American Water contract anywhere other than McAllen. Stated another way, Penncro contends that the evidence was undisputed that Penncro could have performed both the Sprint contract and the American Water contract and that Sprint was required to prove otherwise. In support of its argument, Penncro directs the court to a Tenth Circuit case, *United International Holdings, Inc. v. Wharf (Holdings) Limited*, 210 F.3d 1207 (10th Cir. 2000). In that case, the defendant Wharf orally granted the plaintiff UIH an option to buy 10% of the stock in the defendant's Hong Kong cable system if UIH rendered certain services. *Id.* at 1214. UIH fulfilled its obligation, but Wharf refused to permit it to exercise the option. *See id.* Ultimately, a jury returned a verdict in favor of UIH on all claims in the amount of $125 million. *Id*. at 1228. On appeal, Wharf argued, among other things, that the award of compensatory damages was excessive because it did not account for UIH's duty to mitigate its damages. *Id*. Specifically, Wharf criticized the district court for excluding Wharf's

10

evidence that UIH could have invested elsewhere the funds intended for investment in the cable project. *Id.* at 1230-31. According to Wharf, UIH's failure to invest elsewhere required reduction of any compensatory damage award. *Id.* at 1230.

The Tenth Circuit affirmed the district court's decision on the grounds that Wharf, in its offer of proof prior to trial, did not present any evidentiary support that UIH failed to mitigate its damages. *Id*. at 1230-31. Noting that it was the defendant's burden to prove the affirmative defense of failure to mitigate, the Circuit explained that the defense "will not be presented to the jury unless the trial court determines there is sufficient evidence to support it." *Id*. at 1230. The Circuit then made the following statement:

> Further, production of such evidence would not have compelled admission of mitigation of damages evidence and the giving of a mitigation of damages instruction unless Wharf also offered evidence that UIH could not have accepted both the additional investment opportunity and the [cable] investment.

*Id*. at 1231. It is this statement from the Circuit that Penncro relies on in support of its contention that Sprint has the burden to prove that Penncro could not have performed both the American Water contract and the Sprint contract. Moreover, in support of this statement, the Circuit cites to and quotes from comment f to section 347 of the Restatement (Second) of Contracts, which states "If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract."

The court does not believe that the Circuit's decision in *Wharf (Holdings)* is binding or even persuasive in the context presented here for several reasons. First, the Circuit's statement

11

concerning the nature of Wharf's burden even if it had produced evidence that UIH had failed to mitigate its damages is mere dicta as the Circuit's holding that Wharf had not offered evidence that UIH failed to mitigate could have alone resolved Wharf's appeal on this issue. *See United States v. Rohde*, 159 F.3d 1298, 1302 (10th Cir. 1998) (distinguishing between an alternate holding and dicta). Second, the issue in *Wharf* was the plaintiff's failure to mitigate its damages, an issue that is related to yet significantly different from the issue here–Penncro's successful mitigation efforts. To be sure, if Sprint had maintained in this case (as the defendant did in *Wharf*) that Penncro had left the McAllen facility unutilized after the termination of the Sprint contract and, thus, had failed to mitigate its damages, then Sprint would have had to prove to the court that opportunities were available to Penncro to use the McAllen facility and that Penncro had failed to take advantage of those opportunities. *See Wilson v. Union Pacific R.R. Co.*, 56 F.3d 1226, 1232 (10th Cir. 1995) (in employment context, mitigation instruction warranted only where defendant shows that plaintiff failed to seek employment and also shows that appropriate jobs were available). However, Sprint did not contend at trial that Penncro had failed to mitigate its damages. Rather, Sprint contended that Penncro had successfully avoided loss by finding substitute contracts for the McAllen facility. Finally, the Circuit in *Wharf* purports to apply Colorado law in resolving Wharf's appeal. The court in this case is bound by Kansas law which, in cases presenting facts more analogous to the facts presented here, places the burden of proof squarely on the party who, like Penncro, seeks to show that it could have performed both transactions.

In *Rodriguez v. Learjet, Inc.*, 24 Kan. App. 2d 461 (1997), the Kansas Court of Appeals, in evaluating whether a liquidated damages clause was reasonable in light of the actual harm caused

12

by the breach, addressed the question of whether a particular seller qualified as a "lost volume" seller. *Id*. at 465. As explained by the court in *Rodriguez*, "if a seller would have entered into both transactions but for the breach, then the seller has lost volume as a result of the breach . . . [t]hus, lost profits are awarded to a lost volume seller, notwithstanding that the seller resells the item that a buyer contracted to buy, based on the principle that the seller was deprived of an additional sale and the corresponding profit by the buyer's breach." *Id*. at 466 (citations omitted). Guided by its previous decision in *Jetz Serv. Co. v. Salina Properties*, 19 Kan. App. 2d 144 (1993), the Court of Appeals expressly held that a "seller must establish three factors" to qualify as a lost volume seller: (1) that it possessed the capacity to make an additional sale; (2) that it would have been profitable for it to make an additional sale; and (3) that it probably would have made an additional sale absent the buyer's breach." *Id*. at 467 (citing *R.E. Davis Chem. Corp. v. Diasonics, Inc*., 826 F.2d 678, 684-85 (7th Cir. 1987)). Without question, then, Rodriguez places the burden of proof on the seller to establish that it could have engaged in both transactions but for the breach.

In *Jetz*, the Court of Appeals had applied the lost volume rule outside the context of the sale of goods, finding adequate authority to apply the concept to providers of services. 19 Kan. App. 2d at 149. Although the Court of Appeals in *Jetz* did not expressly place the burden of proof on the seller, the Court of Appeals in *Rodriguez* interpreted *Jetz* as having impliedly done so. *See id.* at 466-67. Moreover, the *Jetz* court, quoting *Murray on Contracts*, emphasized that "a supplier of services may be able to convince a court that he would have been able to perform a second opportunity that became available after the original contract was breached." *Id*. at 149.

13

Significantly, the court also relied upon and quoted from comment f to section 347 of the Restatement (Second) of Contracts: "If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have 'lost volume' and the subsequent transaction is not a substitute for the broken contract." Thus, the Kansas Court of Appeals, relying on the same Restatement section and comment as the Tenth Circuit in *Wharf*,[4] has indicated that the burden of proof lies on the seller to show lost volume status.[5]

Like the Court of Appeals in *Jetz*, Farnsworth also applies the lost volume rule outside the context of the sale of goods and, in doing so, places the burden of proof on the seller to prove lost volume status. Using the example of a building contract in which a builder contracts to build a building on an owner's land for $100,000, at a profit of $10,000, and the owner repudiates the contract before the builder has done anything by way of preparation or performance, Farnsworth explains:

---

[4]While the Circuit in *Wharf* cites to comment f to Restatement (Second) of Contracts § 347, which addresses a party's successful efforts to obtain other contracts and avoid loss, a more appropriate citation given the factual context of *Wharf* might have been to Restatement (Second) of Contract § 350, which addresses a party's failure to make efforts to avoid loss.

[5]The court follows as Kansas law the opinions of the Kansas Court of Appeals in *Rodriguez* and *Jetz* as the Kansas Supreme Court has not addressed the lost volume rule and there is no reason to believe the Kansas Supreme Court would analyze that rule any differently than the Kansas Court of Appeals. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1207 n.1 (10th Cir. 2002) (if state supreme court has not resolved an issue, federal court must follow any intermediate state court decision unless other authority convinces court that state supreme court would decide otherwise). The court also finds the *Jetz* opinion particularly persuasive because the author of that opinion, Judge Larson, was later appointed to the Kansas Supreme Court and another member of the *Jetz* panel presently sits on the Tenth Circuit Court of Appeals.

> [S]uppose that the builder promptly makes a contract with another owner to build an identical building for $100,000, at a profit of $8,000. Is the second contract a substitute for the first, so that the $8,000 profit on the second should be treated as loss avoided and subtracted from the $10,000 damages to which the builder would otherwise be entitled, giving the builder only $2,000? The builder will claim that had the first contract not been broker, the builder could have and would have made both contracts–that the builder has " lost volume" as a result of the breach.

E. Allan Farnsworth, *Contracts* § 12.10 at 887-88 (2d ed. 1990). In the example given by Farnsworth, if

> *the builder can show* or the court will assume *that the builder could and would have expanded its business to take both contracts* and make a combined profit of $18,000, but that as a result of the breach the builder has only one contract (the second one), on which the profit will be $8,000, the builder will be allowed to recover $10,000 damages on the first contract, with no subtraction for profit made on the second contract.

*Id.* § 12.10 at 889 (emphasis added).

While Penncro does not expressly refer to itself as a lost volume seller or, more accurately, a lost volume provider of services, Penncro, in its proposed findings of fact and conclusions of law submitted prior to trial, explicitly directed the court to *Rodriguez* and *Jetz* in support of its proposed conclusion that its damages not be reduced "based on subsequent contracts that would have been available to the plaintiff irrespective of the breach of the first contract." Penncro, then, cannot deny that, in essence, it is claiming lost volume status. Like the plaintiff in *Jetz* and the builder in Farnsworth's example, Penncro asserts that, but for the breach of the first contract, it would have been able to enter into both contracts. In such circumstances, it is Penncro's burden to show that it could have done so and not Sprint's burden to show that Penncro could not have done so. Penncro did not adduce any evidence at trial suggesting that the specific

15

American Water contract (as opposed to collections work in general) could have been performed somewhere other than McAllen even though Penncro ultimately decided to perform the work at McAllen. While Penncro set forth evidence that it had additional capacity at other locations or could have leased additional space from other vendors, Penncro did not show that American Water would have been amenable to having its work performed at a location other than McAllen and did not establish that it could have hired the requisite workforce in those markets to handle the American Water contract.

In sum, Sprint was required to establish that Penncro "avoided loss" as a result of the breach and, as set forth above, it has done so. *See Resolution Trust Corp. v. Fleischer*, 880 F. Supp. 1446, 1451 (D. Kan. 1995) (breaching party is entitled to offset benefits if it proves that the breach resulted in a benefit to plaintiff); *John Call Engineering, Inc. v. Manti City Corp.*, 795 P.2d 678, 681 (Utah App. 1990) (mitigation doctrine requires breaching party to show why the damages sought are not proper because of successful efforts to mitigate). At that point, Penncro was required to show that an offset or deduction was not appropriate because it could have performed both the American Water contract and the Sprint contract or, stated another way, that the American Water contract was not a substitute for the Sprint contract. *See B.N.E. Swedbank, S.A. v. Banker*, 1993 WL 152392, at *4-5 (S.D.N.Y. Mar. 8, 1993) (for offset defense, breaching party must establish that breach conferred a benefit on other party; then burden is on other party to show that if an offset was imposed, the breaching party would be "either unjustly enriched or sheltered from any appreciable liability"); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 490 (S.D.N.Y. 1987) (because plaintiff bears the burden of proving its claim for

damages, it must show that an offset would leave breaching party unjustly enriched).

For the foregoing reasons, the court concludes that Sprint has established that the profits earned by Penncro from the American Water contract in McAllen constituted "avoided loss" such that the entire incremental net profit of $6,520,222.00 (from both AT&T and American Water) is appropriately deducted from Penncro's damages. Consequently, the court need not address Penncro's argument that Sprint failed to allocate profits between AT&T and American Water.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's motion for amendment of judgment and for partial reconsideration (doc. 165) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 17th day of July, 2006, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

17