## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Penncro Associates, Inc.,**

      **Plaintiff,**

**v.**                                                                                  **Case No. 04-2549-JWL**

**Sprint Spectrum L.P. d/b/a Sprint PCS,**

      **Defendant.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff Penncro Associates, Inc. ("Penncro") filed this suit against Sprint Spectrum L.P. d/b/a Sprint PCS ("Sprint") alleging that Sprint breached a contract between the parties under which plaintiff was to provide first-party inbound collections services for Sprint and seeking damages for the breach. On the parties' motions for summary judgment, the court concluded that Sprint's termination of its contract with Penncro was in breach of the contract's terms and entered summary judgment in favor of Penncro on the issue of Sprint's liability.

Over the course of three days in April 2006, a trial to the court was held on the issue of Penncro's claims for damages for direct economic loss and prejudgment interest. In May 2006, the court issued its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), awarding Penncro damages for direct economic loss in the amount of $17,136,612.00 and declining to award prejudgment interest. This matter is presently before the court on Penncro's amended motion for attorneys' fees, expert fees and costs (doc. 171). As explained below, the motion is granted in part and denied in part.

Section 16.5 of the Master Services Agreement executed by the parties provides that the "prevailing party" in any formal dispute will be entitled to "reasonable attorney's fees and costs, including reasonable expert fees and costs." Pursuant to this provision, and having prevailed on its breach of contract claim, Penncro seeks attorneys' fees, expert fees and costs totaling $7,283,124.51, a figure based largely on a contingent fee arrangement between Penncro and its counsel pursuant to which Penncro's counsel would receive 40 percent of any judgment obtained at trial.[1] In the alternative, Penncro seeks attorneys' fees in an amount equal to two times the lodestar amount, which Penncro calculates as $4,551.000, plus expert fees and costs.

As a threshold matter, Sprint contends that Penncro's fee request is premature because its entitlement to fees is not absolute. As Sprint highlights, section 16.5 of the Master Services Agreement, while providing reasonable attorneys' fees and costs to the prevailing party,  also provides that if the prevailing party "rejected a written settlement offer that exceeds its recovery, the offering party will be entitled to its reasonable attorney's fees and costs." According to Sprint, this fee-shifting provision requires that the court defer resolution of Penncro's motion, as the court will not know whether Penncro's ultimate recovery exceeds a written offer from Sprint until after the appeal process is complete and any additional settlement negotiations have occurred. The court has previously rejected analogous arguments and, in the absence of a

---

[1]Penncro asserts that it will supplement its motion to request additional fees and costs incurred in connection with "this motion, post-trial motions and any appeal of this matter." To the extent plaintiffs intend to seek fees in connection with an appeal, plaintiffs must direct such a request to the Tenth Circuit. *See Hoyt v. Robson Cos.*, 11 F.3d 983, 985 (10th Cir. 1993) (an application for appeal-related attorneys' fees must first be made to the appellate court).

2

compelling reason to stay Penncro's claim for fees pending the outcome of the parties' appeals, the court rejects Sprint's argument.  *See McKinsey v. Sentry Ins.*, 1992 WL 279753, at *1 (D. Kan. Sept. 9, 1992) ("While it is true that the plaintiff may be entitled to a refund of any fees awarded to the defendant if the court of appeals were to reverse this court's ruling on the merits, it is at least equally likely that the court of appeals will affirm the summary judgment award, making any postponement of a fee award unnecessary.").  The court proceeds, then, to resolve Penncro's motion.

**I.**      **Penncro's Request for Attorneys' Fees Representing its Counsel's Contingent Fee**

In its motion, Penncro asks the court to award attorneys' fees in an amount equal to its counsel's contingent fee, asserting both that the court is obligated to do so and that the court has discretion to do so.  The court begins with, and rejects, Penncro's assertion that the court is "obligated" to award Penncro an amount of fees equal to that of its counsel's contingent fee.  In support of its argument, Penncro, quoting from the Tenth Circuit's decision in *United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533 (10th Cir. 1987), asserts that the purpose of a contractual fee award is "to make the non-breaching party whole" and that Penncro will be made whole only by an award equal to the amount it actually paid its counsel.  In *C.J.C., Inc.*, however,  the Circuit merely recognized that the purpose of the particular contractual provision in that case, which entitled the prevailing party to "all attorney's fees and collection expenses," was to make the non-breaching party whole.  834 F.2d at 1547. In contrast, section 16.5 of the Master Services Agreement does not entitle the prevailing party

to all fees and costs; it entitles the prevailing party to "reasonable" fees and costs.  Moreover, both parties agree that Kansas law applies in determining a fee award in this case, *see North Texas Prod. Credit Ass'n v. McCurtain County Nat'l Bank*, 222 F.3d 800, 817 (10th Cir. 2000) ("In a diversity case, the matter of attorney's fees is a substantive legal issue and is therefore controlled by state law."), and the Kansas Supreme Court has expressly rejected the argument advanced by Penncro.

In *Johnson v. Westhoff Sand Co.*, 135 P.3d 1127 (Kan. 2006), the district court awarded the plaintiffs in a garnishment action attorneys' fees in an amount that mirrored the contingent fee arrangement between plaintiffs and their counsel–33 percent of the trial judgment.  *Id.* at 1132.  The defendant appealed.  *Id*.  The Kansas Court of Appeals affirmed the judgment but remanded the fee issue to the district court for consideration of the factors listed in Rule 1.5(a) of the Kansas Rules of Professional Conduct (KRPC).  *Id*.[2]  The Court of Appeals also awarded the plaintiffs $12,000 for fees incurred on appeal, rejecting the plaintiffs' argument that they were entitled, at that point, to attorneys' fees totaling 40 percent of the judgment as contemplated by their contingent fee agreement's appeal provision.  *Id*. at 1131-32.  On remand, the district

---

[2]Eight factors are identified in Rule 1.5(a) for consideration in determining the reasonableness of an attorney fee: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent." *Id*. at 1135-36 (quoting Rule 1.5(a)).

court again awarded the plaintiffs an amount of fees equal to 33 percent of the judgment entered. *Id.* at 1133.  The defendant appealed again.  *Id.*  The Court of Appeals affirmed the fee award and declined to award the plaintiffs fees incurred for their appellate work related to the second appeal.  *Id.*  Both parties then petitioned the Kansas Supreme Court for review, which the Court granted.  *Id.*

Pertinent to Penncro's "make whole" argument, the plaintiffs in *Westhoff Sand* argued that the Court of Appeals $12,000 fee award was erroneous and asked the Kansas Supreme Court to award fees representing the difference between what the district court had awarded them through trial (which, in turn, represented 33 percent of the judgment and also mirrored the plaintiffs' contingent fee arrangement which entitled plaintiffs' counsel to 33 percent of the amount of recovery through trial judgment) and their 40 percent entitlement after appeal, pursuant to the fee arrangement's appeal provision.  *Id.* at 1141-42.  The plaintiffs asserted that such a fee award would "make them whole" because it would reflect the amount that they had actually paid their counsel.  *Id.* at 1142.  In response, the defendant contended that the plaintiffs' "make whole" argument effectively eliminated the "reasonable sum" language found in K.S.A. § 40-256, the statutory basis for fees in *Westhoff Sand*.  *Id.*  The Kansas Supreme Court rejected the plaintiffs' argument:

> We find nothing in KRPC 1.5(a) to support the [plaintiffs'] "being made whole" argument.  KRPC 1.5 contains nothing that suggests one factor is to dominate the other seven, *i.e.*, that the one creates a presumption that controls unless and until it is rebutted by the others, whether solely or collectively.  Indeed, the "contingent fee" factor which they declare paramount is the last one of eight enumerated.

*Id.*  In light of *Westhoff Sand* and the language in the parties' contractual fee provision entitling

5

the prevailing party to a "reasonable" fee, the court rejects Penncro's argument that it is entitled to be "made whole" such that the fee award in this case must mirror the contingent fee award actually paid by Penncro to its counsel.

The court turns, then, to Penncro's argument that the court, in its discretion, should award Penncro an amount of fees equal to the contingent fee Penncro paid to its counsel. According to Penncro, an attorneys' fee award in this amount is reasonable and not inconsistent with the factors set forth in Rule 1.5(a). While nominally based on the factors set forth in Rule 1.5(a), Penncro's argument is based primarily on the contingent fee arrangement itself and the starting point for Penncro's "reasonableness" analysis is the contingent fee it paid to its counsel, without regard to whether that fee bears any relationship to the time actually spent by Penncro's counsel on the case. While the court does not dispute that it should consider under Kansas law the contingent fee agreement between Penncro and its counsel when awarding fees, it is beyond dispute that "the contingent fee agreement cannot be the sole factor considered." *See Westhoff Sand*, 135 P.3d at 1140. Moreover, the court believes that Penncro's analysis reverses the appropriate process for determining a reasonable fee. Rather than starting with the amount of the contingent fee and working backwards to determine whether the fee is reasonable in light of the factors set forth in Rule 1.5(a), the court is required under Kansas law to "analyze all of the applicable factors" to arrive at a reasonable number. If the number calculated by the court "corresponds to an amount as computed under the [contingent fee] agreement's formula, that number should not be deemed unreasonable per se." *Id*. The court, then, will proceed to determine a reasonable fee considering all relevant factors including, but certainly not limited

6

to, the contingent fee agreement between Penncro and its counsel.

## II.     Determining a Reasonable Fee

In determining a reasonable attorney fee, the Kansas Supreme Court has instructed that the best practice is for the trial court to first perform a lodestar analysis (time reasonably spent multiplied by a reasonable hourly rate) so that the fee award bears "some relationship to the time expended by the attorneys," and then to exercise its discretion, if appropriate, to modify the lodestar amount based on the other factors set forth in Rule 1.5(a). *See Gigot v. Cities Serv. Oil Co.*, 241 Kan. 304, 319-20 (1987); *see also Westhoff Sand*, 135 P.3d at 1141 (Kansas law requires consideration of all relevant factors listed in Rule 1.5(a), not merely time spent multiplied by an hourly rate); *Link, Inc. v. City of Hays*, 268 Kan. 372, 381-82 (2000) (affirming district court's award of fees in mandamus action where court determined fee based on lodestar analysis and also heard evidence on the factors listed in Rule 1.5); *City of Wichita v. B G Products, Inc*., 252 Kan. 367, 374-75 (1993) (affirming district court's award of fees in condemnation proceeding where court determined fee based on lodestar analysis and also heard evidence on the factors listed in Rule 1.5).

### A.     *Reasonable Hours Expended*

To meet their burden of proving the number of hours reasonably spent on the litigation, Penncro "must submit meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours

were allotted to specific tasks." *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1233 (10th Cir. 2000) (citing *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249-50 (10th Cir. 1998)).[3] The district court, then, may reduce the number of hours when the time records provided to the court are inadequate. *Id*. at 1233-34. The court has reviewed the billing records submitted by plaintiffs and those records are sufficient to meet Penncro's burden. Thus, it is Sprint's burden to show that the hours claimed by Penncro are unreasonable. *See Robinson v. City of Edmond*, 160 F.3d 1275, 1279, 1285-86 (10th Cir. 1998) (plaintiffs requested $186,000 in fees and defendants generally objected to this request as unreasonable but specifically articulated objections to only $43,000 of the request, leaving $142,000 in requested attorney's fees "not separately contested;" district court abused its discretion in reducing fee award in part because the end result was a fee award that was below the "unrebutted," "unchallenged," and "uncontested" amount of the fee request); *Sheets v. Salt Lake County*, 45 F.3d 1383 (10th Cir. 1995) (affirming trial court's fee award in part because defendants failed to proffer any evidence

---

[3]While the court recognizes that Kansas law applies to Penncro's motion for fees, Kansas law is not well-defined on certain issues relating to reasonable rates. With respect to issues Kansas courts have not addressed, the court believes the Kansas courts would look to federal cases regarding the award of attorney fees. This conclusion is evidenced by the Kansas Supreme Court's citation to Tenth Circuit law in determining the amount of attorney fees to award in a Kansas state law case. *See Davis v. Miller*, 269 Kan. 732, 748 (2002) (citing to Case, 157 F.3d at 1250). Accordingly, the court, like the Kansas Supreme Court in *Davis*, will look to federal law when Kansas state law has not addressed the issue. *Vanover v. Cook*, 260 F.3d 1182, 1186 (10th Cir. 2001) (reasoning that absent direction from the highest state court, federal courts must "predict the course that body would take if confronted with the issue").

that the hours claimed were unreasonable and, instead, simply made unsubstantiated allegations that the fees were duplicative and exorbitant in nature).

In its opposition to Penncro's motion, Sprint asserts that Penncro's counsel "overworked" this case as evidenced by the fact that Penncro's lawyers spent nearly twice as many hours working on the case as Sprint's lawyers. According to Sprint, the "excessive" time spent by Penncro's lawyers is a function of several factors. First, Sprint challenges the substantial amount of time that Penncro's lawyers–who are based in Philadelphia and presumably were unfamiliar with Kansas law–spent researching Kansas contract law. Second, Sprint complains that Penncro overstaffed the case, often having multiple lawyers record time for the same tasks on the same day. Third, Sprint contends that Penncro billed far too much time for trial preparation and the trial itself in light of its seven-member trial team. Finally, Sprint asserts that Penncro inappropriately used lawyers to perform tasks that could have and should have been performed by paralegals. In light of Penncro's asserted failure to exercise proper billing judgment in these specific respects, Sprint asks the court to reduce Penncro's hours by 40 percent. As will be explained, while the court makes certain reductions in the number of hours billed by certain lawyers, the court does not believe that a blanket reduction of hours is warranted.

As an initial matter, Sprint makes much of the fact that Penncro's lawyers spent twice as much time on this case as Sprint's lawyers. Indeed, Sprint seeks a 40 percent reduction in the hours spent by Penncro in large part because of the difference in time spent by the two sides. As the Tenth Circuit has stated, however, the number of hours expended by opposing counsel "is not an immutable yardstick of reasonableness." *See Shaw v. AAA Engineering & Drafting,*

*Inc.*, 213 F.3d 538, 542-43 (10th Cir. 2000) (district court did not abuse its discretion in finding counsel's hours reasonable in spite of the contrast with defense counsel's time; plaintiff's counsel spent nearly twice as many hours prosecuting case as defense counsel did defending case) (quoting *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998)).   In determining the number of hours reasonably expended by Penncro, the court gives little weight to the number of hours expended by Sprint as there are several reasons why Penncro's counsel may have needed to spend more hours on the case than Sprint's counsel.  Penncro, of course, had the burden of proof in this breach of contract case that, despite Sprint's efforts to characterize it as run-of-the-mill, was highly complex.  The case involved complicated legal and factual issues concerning contract interpretation, contract modification and waiver of another party's breach through course of performance.  While the case was not document-intensive as compared to other complex commercial cases, it was certainly fact-intensive and driven by difficult legal principles.  Moreover, in light of the fact that Penncro's counsel had taken the case on a contingent fee basis (and assumed the risks associated with that fee structure), it is understandable that Penncro's counsel would have worked tirelessly to maximize their chances of success, including framing the facts of the case in light of existing case law, formulating arguments concerning the appropriate interpretations of various provisions of the parties' contract and devising alternative theories of liability and damages.  For these reasons, it is not surprising to the court that Penncro's counsel spent more time on the case than Sprint's counsel and the fact that Penncro's counsel spent twice as much time as Sprint's counsel does not, in and of itself, suggest to the court that Penncro's hours were unreasonable.

For largely the same reasons, the court is not persuaded by Sprint's argument that Penncro's counsel spent too much time researching Kansas contract law.  Sprint, despite its obligation to do so, *see Public Serv. Co. of Colorado v. Continental Casualty Co.*, 26 F.3d 1508, 1521 (10th Cir. 1994) ("We do not feel that the trial judge was obligated to comb the evidence before him–consisting of voluminous attorney billing records–to ferret out gaps or inconsistencies in the evidence presented on the fees."), has not provided the court with the number of hours that Penncro spent researching Kansas law and does not highlight any specific billing entries related to this issue.  In any event, Sprint contends that Penncro's counsel spent substantial time researching Kansas law because of counsel's unfamiliarity with Kansas law and that Sprint should not be penalized for Penncro's decision to hire counsel from Philadelphia as opposed to counsel located in Kansas.  As should be clear from the court's discussion in the preceding paragraph, however, the court believes that competent counsel in this case–regardless of whether counsel was from Kansas or Philadelphia–necessarily would have spent substantial time researching Kansas contract law.  In short, Sprint has not shown that a reduction is warranted for time spent on this research.

Next, Sprint asserts that Penncro's counsel overstaffed the case and, thus, inappropriately had several lawyers billing time for the same tasks on the same day.  The Tenth Circuit has advised that a district court, in determining the reasonable number of hours expended, should examine "the potential duplication of services."  *See Case*, 157 F.3d at 1250.  "For example, [if] three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time."  *Id*. (quoting *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983)).  Sprint

11

has identified specific billing entries, totaling 221 hours of work and $65,000 in fees, which appear to reflect a duplication of services. The court has reviewed the entries identified by Sprint and finds that some, but not all, are appropriate. Indeed, it is not unreasonable to have both a partner and an associate spend time working on a summary judgment brief or reviewing documents in preparation for trial. The entries highlighted by Sprint, however, do reflect some duplication of tasks (e.g., observing depositions, participation in Rule 26 conference, preparing preliminary witness list) and the court will deduct 14 hours billed by Mr. Belgam; 28 hours billed by Ms. Branyan; and 24 hours billed by Mr. Norris. *See id.* (There is no requirement that district courts identify and justify each disallowed hour, nor is their any requirement that district courts announce what hours are permitted for each legal task.).

Sprint also challenges the hours spent by Penncro's counsel preparing for trial and in connection with the trial itself. Sprint's specific complaint is that Penncro's counsel, utilizing a seven-member trial team, billed the time that younger lawyers spent observing trial or assisting in trial preparation and during trial. The court has reviewed the trial-related billing entries submitted by Penncro and agrees with Sprint that a reduction in the number of hours billed is warranted, primarily time billed by Ms. Branyan and Mr. Norris during trial as certain billing entries indicate that much of the work performed by one was duplicative of work performed by the other or otherwise indicate that time was billed for observing trial or providing assistance that, while helpful to the associate's development, was not necessary to Penncro. The court, then, will deduct 116 hours billed by Ms. Branyan between April 12, 2006 and April 22, 2006 and will deduct 111 hours billed by Mr. Norris during this same time period.

Finally, Sprint contends that Penncro's counsel spent time completing tasks that could have and should have been performed by legal assistants.  While Sprint generally contends that Penncro's counsel spent time on "document database/review issues, setting up depositions, and trial preparation" that could have been handled by legal assistants, Sprint does not direct the court to any specific suspect billing entries and the court is not inclined to sift through the voluminous time records submitted by Penncro to discover for itself whether and to what extent the time records reflect time spent by lawyers that should have been spent by legal assistants. *See Case*, 157 F.3d at 1250 (where prevailing party submitted well over a hundred pages in billing statements with several entries per page, "[i]t is neither practical nor desirable to expect the trial court judge to have reviewed each paper in th[e] massive case file to decide, for example, whether a particular motion could have been done in 9.6 hours instead of 14.3 hours."). Sprint has not shown that a reduction of hours is warranted for work performed by lawyers that could have been performed by legal assistants.

B.     *Reasonable Rates*

Having determined the number of hours reasonably expended on the litigation, the court turns to determine reasonable hourly rates for the attorneys and other personnel involved in the litigation.  "The first step in setting a rate of compensation for the hours reasonably expended is to determine what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1256 (10th Cir. 1998); *see also Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984) (stating

13

a reasonable hourly rate comports with rates "prevailing in the community for similar services for lawyers of reasonably competent skill, experience, and reputation"). "The party requesting the fees bears the burden of showing that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1234 (10th Cir. 2000) (quotation omitted). The focus must be on the prevailing market rate in the relevant community. *Id.* The court must determine the hourly rate by examining what the evidence shows the market commands for analogous litigation. *Id.* "The court may not use its own knowledge to establish the appropriate rate unless the evidence of prevailing market rates before the court is inadequate." *Id.*

Penncro asserts that its counsel charged the following average hourly rates to other clients during the period of this litigation and would have charged Penncro these rates but for the contingent fee agreement: For lead counsel Richard P. McElroy, an average hourly rate of $581.50; for partner Neal C. Belgam, an average hourly rate of $407.03; for senior associate Sheila E. Branyan, an average hourly rate of $318.46; and for junior associate Jason W. Norris, an average hourly rate of $211.45. While the record is not entirely clear, it appears that Penncro's counsel charged hourly rates ranging from $185 to $305 for work done by paralegals. Penncro asserts that these rates fall within the middle of the range of rates charged by Philadelphia attorneys in complex commercial litigation and are also reasonable when viewed against prevailing rates in Kansas City. Sprint contends that the rates charged by Penncro's counsel are plainly excessive for the Kansas City market.

14

Both parties have submitted evidence concerning prevailing market rates in this community.[4]  Penncro submits the affidavit of Patrick J. Stueve, a partner of Stueve Siegel Hanson Woody LLP with significant experience in handling complex commercial cases and knowledge of prevailing rates in the Kansas City market.  According to Mr. Stueve, senior commercial trial lawyers in Kansas City with expertise, skill and reputation similar to Mr. McElroy (the evidence reflects that Mr. McElroy has almost 40 years of experience trying complex commercial cases and has been inducted as a Fellow in the American College of Trial Lawyers) charge between $340 to $540 per hour.  Penncro also submits certain results from the National Law Journal's 2004 and 2005 law firm billing surveys which reflect that large, private law firms in Kansas City charge hourly rates ranging from $200 to $695 for partners.  These surveys, however, are not persuasive in ascertaining a reasonable rate in this case, as the rates

---

[4]While Penncro has submitted additional evidence concerning the prevailing market rate in Philadelphia, where its counsel is based, the court is concerned only with the prevailing market rate in Kansas City, the place of trial.  *See Case*, 157 F.3d at 1256 (relevant market is the area in which the litigation occurs); *Ramos v. Lamm*, 713 F.2d 546, 555 910th Cir. 1983) (court should establish billing rate "based upon the norm for comparable private firm lawyers in the area in which the court sits" even when "the lawyers seeking fees are from another area"), overruled in part on other grounds by *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 725 (1987)).  Penncro insists that the court should look to Philadelphia as the relevant market as Penncro was severely limited in its choice of counsel in Kansas City in light of the number of "quality" Kansas City firms that would have had a conflict representing Penncro, having represented Sprint in previous matters.  Penncro, however, does not submit any evidence concerning the number or types of firms that would have had a conflict and does not submit evidence suggesting that it actually sought representation in Kansas City but could not find adequate representation in light of the alleged conflict issue.  In the absence of such evidence, the court sees no reason to depart from the general rule that the place of trial is the relevant market for purposes of determining a reasonable hourly rate.

reflected in the surveys are merely those reported by large firms and do not identify the experience, skill or reputation of any lawyers who charge the rates reported and do not identify whether any other circumstances exist that might justify a higher rate in a particular case.

Sprint's lead counsel, Russell S. Jones, Jr., avers that Mr. McElroy's average hourly rate is much higher than rates commonly charged by comparable lawyers in Kansas City.  In his opinion, a reasonable hourly rate for Mr. McElroy, based on Kansas City metropolitan norms, would be $325.  According to Mr. Jones, he charged Sprint an average hourly rate of $285 and that rate was comparable to rates charged by other experienced litigators at his own firm.  Sprint also submits the affidavit of Bruce Keplinger, a partner of Norris & Keplinger, LLC with substantial experience in handling complex commercial cases.  Mr. Keplinger avers that a reasonable hourly rate in this community for lead counsel handling a complex commercial case would range from $175 to $300.  Mr. Keplinger's affidavit on this issue, however, is not as persuasive as it might be as it is based primarily on Mr. Keplinger's knowledge of Mr. Jones' hourly rates (so in that sense it is duplicative of Mr. Jones' affidavit) and hourly rates that judges in this District have awarded in the past.  The Tenth Circuit has cautioned that it is inappropriate for a district court to set an hourly rate by simply using the rates it consistently grants.  *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1234 (10th Cir. 2000).

In large part, then, the court is left with competing affidavits (neither one of which provides much detail on the reasonable rate issue) from two attorneys, Mr. Stueve and Mr. Jones, and a reasonable hourly rate ranging from $285 at the lowest end to $540 at the highest end.  The court declines to set an hourly rate at the low end of the range, as that number was simply the

16

rate that Mr. Jones charged Sprint in this case. Similarly, the court declines to set an hourly rate at the high end of the range, as Mr. Stueve does not suggest that lawyers in this community routinely charge upwards of $500 per hour. Ultimately, after reviewing these affidavits in light of the court's own knowledge of the prevailing market rate in analogous litigation for experienced, lead counsel such as Mr. McElroy, the court determines that an hourly rate of $450 is reasonable for Mr. McElroy. *See Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc*., 295 F.3d 1065, 1079 (10th Cir. 2002) ("Where a district court does not have before it adequate evidence of prevailing market rates, the court may use other relevant factors, including its own knowledge, to establish the rate."). As explained above in section II.A of this opinion, this case involved complex legal issues and required both an understanding of those issues and an ability to develop the factual record sufficient to permit a skilled application of those facts to the applicable legal principles. Mr. McElroy's experience and skill level enabled him to handle this case proficiently and effectively and, in the court's experience, attorneys in this community with experience and skill comparable to Mr. McElroy who represent clients in these types of complex commercial cases typically command hourly rates near $450 per hour.

The evidence submitted by the parties concerning prevailing market rates for the individuals supporting Mr. McElroy is even more scant. Penncro does not provide any evidence suggesting a range of prevailing market rates in this community for partners with experience akin to Mr. Belgam (a 1989 law school graduate with nearly 17 years of litigation experience), for associates with experience akin to Ms. Branyan (a 1995 law school graduate with 7 or 8 years of litigation experience) or Mr. Norris (a 2004 law school graduate), or for paralegals. Mr.

Stueve, however, concedes that the hourly rates charged by these individuals are "above, but very close to, the higher end of rates customarily charged by staff and lawyers of Kansas City firms with similar reputation, skill, and experience." Thus, while Mr. Stueve's affidavit establishes that the rates charged by Penncro's counsel and staff are higher than even the higher end of the range charged in this area, it sheds no light on what the range might be.

Mr. Keplinger, on behalf of Sprint, avers that the "junior" partners at his firm would have billed $200 per hour on this particular matter and that their associates would have billed from $150 to $175 per hour on this matter. This evidence, however, does not reflect whether those rates are consistent with those charged by comparably skilled attorneys in the area. *See Guides, Ltd.*, 295 F.3d at 1079 (evidence on hourly rates not persuasive where it served only to establish particular attorney's rate and did not establish that rate charged was consistent with rate charged by comparably skilled lawyers in the community). Similarly, Mr. Keplinger avers that the legal assistants at his firm "customarily bill at $70 per hour." Again, this evidence does not reflect whether the rates charged by the legal assistants at Mr. Keplinger's firm are consistent with the rates charged by legal assistants at other firms in the area. Mr. Jones avers that partners at his firm with experience akin to Mr. Belgam charge between $235 and $265 and that these rates are consistent with rates charged by attorneys of comparable skill and experience in the community. He further avers that associates at his firm with experience akin to Ms. Branyan charge between $175 and $200 and that these rates are consistent with rates charged by attorneys of comparable skill and experience in the community. In Mr. Jones' opinion, a reasonable hourly rate for Mr. Belgam would be $240; a reasonable hourly rate for Ms. Branyan and Mr. Norris would be $195;

and a reasonable hourly rate for paralegals would be $120. He avers that these rates would be consistent with rates charged by lawyers and staff of comparable experience and skill in the community.

The court concludes that a reasonable hourly rate for Mr. Belgam is $265, the highest end of the range that, according to Mr. Jones, is consistent with rates in this community for partners with experience similar to Mr. Belgam. The court declines to adopt the lower rate suggested by Mr. Jones in light of Mr. Belgam's years of litigation experience and the breadth of that experience. The court declines to utilize a rate higher than $265 because Penncro simply has provided no evidence demonstrating that a higher rate is consistent with the rates in this community. With respect to Ms. Branyan and Mr. Norris, the court will establish hourly rates of $200 and $175, respectively, reflecting the high and low end of the range that Mr. Jones avers is consistent with associates of similar experience in this community. Although Sprint suggests an hourly rate of $195 for both Ms. Branyan and Mr. Norris, the court believes that some rate differential is appropriate in light of the difference in years of experience between these individuals. Again, the court declines to utilize higher rates in the absence of evidence from Penncro indicating that higher rates are prevailing in this community. Finally, the court adopts Sprint's suggestion that an hourly rate of $120 is appropriate for work performed by legal assistants in this case.

C.      *Calculation of the Lodestar*

Based on the foregoing, the court determines that the lodestar amount in this case is

19

$1,551,794.00. This figure is based on the following calculations: 1554.00 hours billed by Mr. McElroy at an hourly rate of $450 (totaling $699,300.00); plus 1221.20 hours billed by Mr. Belgam at an hourly rate of $265 (totaling $323,618.00);[5] plus 1259.50 hours billed by Ms. Branyan at an hourly rate of $200 (totaling $251,900.00);[6] plus 822.40 hours billed by Mr. Norris at an hourly rate of $175 (totaling $143,920.00);[7] plus 1108.80 hours billed by legal assistants at an hourly rate of $120 (totaling $133,056.00).

## D.   *Modification of Lodestar Based on Rule 1.5(a) Factors*

Determining the lodestar amount does not, however, end the court's analysis of determining a reasonable fee and the court now considers whether any of the other factors set forth in Rule 1.5(a) justify a modification of the lodestar amount. *See Gigot v. Cities Serv. Oil Co.*, 241 Kan. 304, 319-20 (1987).[8] Penncro asserts that an enhancement of the lodestar amount is appropriate (and suggests a multiplier of 2) for three reasons: to reflect the existence of the

---

[5]To arrive at the number of hours billed by Mr. Belgam, the court has deducted 14 hours (as explained above in section II.A) from the summary of hours provided by Penncro and generated by Penncro's billing software.

[6]To arrive at the number of hours billed by Ms. Branyan, the court has deducted 144 hours (as explained above in section II.A) from the summary of hours provided by Penncro and generated by Penncro's billing software.

[7]To arrive at the number of hours billed by Mr. Norris, the court has deducted 135 hours (as explained above in section II.A) from the summary of hours provided by Penncro and generated by Penncro's billing software.

[8]Aside from its arguments concerning the initial calculation of the lodestar amount, Sprint does not contend that a reduction of the lodestar amount is warranted.

contingency fee arrangement and the need to compensate for the risk of loss associated with that arrangement; to recognize the significant results achieved by Penncro's counsel; and the qualifications and experience of Penncro's counsel.  Before turning to Penncro's argument concerning the contingent fee arrangement, the court addresses, and rejects, the arguments concerning the results achieved and the experience of counsel.  While Penncro's counsel certainly obtained satisfactory results in this case, those results were not so extraordinary as to justify an enhancement of the lodestar.  Indeed, Penncro did not recover the full amount that it sought against Sprint and Sprint achieved favorable results on several key issues, including the "loss avoided" issue.  Moreover, while Penncro's counsel was highly qualified and brought the necessary experience to this case, those qualifications and experience are reflected in the hourly rate that the court has established for Penncro's counsel, particularly Mr. McElroy.  The court, then, sees no reason to modify the lodestar amount based on these factors.  *See Blum v. Stenson*, 465 U.S. 886, 897-900 (1984) (skill and experience of counsel, quality of representation and results obtained are presumably reflected and therefore generally subsumed within the lodestar and consequently will not justify an enhancement).

The court also declines to award a contingent risk multiplier to the lodestar amount and concludes that the lodestar amount calculated above constitutes a reasonable fee in this case.  While risk-multipliers are not available under federal law, *see Burlington v. Dague*, 505 U.S. 557 (1992), the Kansas Supreme Court has questioned the applicability of *Dague* in other contexts and has instructed that a district court should consider a contingent fee arrangement as one factor in awarding attorneys' fees.  *Johnson v. Westhoff Sand Co.*, 135 P.3d 1127, 1139-40 (2006).  Of

course, a risk-multiplier is not mandatory under Kansas law and the court's duty is to fix a fee that is reasonable. *See id.* at 1140.

Penncro sets forth ample evidence concerning the reasonableness of the contingent fee agreement that it entered into with its counsel and the court certainly recognizes that such agreements are routinely entered into and does not question that the agreement in this case was reasonable to both Penncro and its counsel. However, the mere fact that a contingent fee is "a reasonable fee from the standpoint of the parties to the contract" does not mean "that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant." *See id.* In the same vein, while Penncro was certainly entitled to shift its risk of loss to its counsel and to pay a premium for success (much like someone insures against risk by paying a premium for an insurance policy), and while Penncro's counsel was entitled to assume that risk and to receive a premium based on the results obtained, Penncro has not advanced any persuasive reason why Sprint should ultimately have to assume that risk in the form of a lodestar multiplier, particularly when the lodestar in this case already takes into account the higher number of hours that Penncro's counsel put into the case in light of the risk it assumed.

## III.    Other Fees, Costs and Expenses

In addition to its attorneys' fees, Penncro seeks to recover $43,746.89 in attorneys' fees paid to and costs incurred by local counsel; to recover $71,199.76 for costs paid directly by Penncro; to recover $123,845.62 for costs incurred by Penncro's counsel and reimbursed by Penncro; and $189,687.44 for expert fees and expenses. Sprint contends that certain deductions

should be made in each category except the amount of costs paid directly by Penncro,[9] an amount which Sprint does not challenge.

With respect to attorneys' fees paid to and costs incurred by local counsel, Sprint suggests a deduction of $2012.50, representing fees paid by Penncro to local counsel in St. Louis in connection with the third-party deposition of a NARS representative.[10]  This deposition was taken  solely in an effort to support Penncro's claim for punitive damages based on Penncro's intentional breach of contract theory.   As Penncro's claim for punitive damages was unsuccessful, Sprint contends Penncro should not recover fees related to it.  The court agrees. On summary judgment, the court held that punitive damages are not available under Kansas law based solely on a breach of contract theory and that the parties, contrary to Penncro's assertion, had not "contracted around" Kansas law by expressly permitting a party to recover punitive damages for a willful breach.  As the NARS issue was distinct in all respects from Penncro's successful claims, and the fees incurred by local counsel with respect to this claim are easily severable, the court will deduct these fees from Penncro's request.  *See Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983) (a plaintiff cannot receive fees for time spent on "distinctly different claims for relief that are based on different facts and legal theories" and on which the plaintiff does not succeed).  The court, then, will award Penncro $41,734.39 in fees paid to and costs incurred by local counsel.

---

[9]Penncro does not address any of Sprint's suggested deductions in its reply brief.

[10]NARS is the entity to which Sprint transferred much of its third-party collections work after terminating its contract with Penncro.

With respect to costs incurred by Penncro's counsel, Sprint suggests a deduction of $2162.97 for travel and court reported costs associated with the NARS deposition.  For the reasons explained above, the court will make this deduction.  *See also Burton v. R.J. Reynolds Tobacco Co.*, 395 F. Supp. 2d 1065, 1075 (D. Kan. 2005) (court would "endeavor to disallow costs where the record reveals that plaintiff necessarily incurred those costs prosecuting claims upon which he was ultimately unsuccessful").

Sprint next suggests a deduction of $25,552.00 from the costs incurred by Penncro's counsel (and reimbursed by Penncro), the amount of Westlaw charges billed by Penncro's counsel on this case.  Sprint's counsel avers that, to his knowledge, most large law firms have flat-fee arrangements with Westlaw such that it constitutes an element of firm overhead not ordinarily billed to clients.  In the absence of evidence from Penncro that the research cost was in fact paid by its counsel to the third-party provider and that research cost is customarily charged by the firm to its clients as a separate disbursement, the court will make the deduction. *See Invessys, Inc. v. McGraw-Hill Cos., Ltd.*, 369 F.3d 16, 22-23 & n.5 (1st Cir. 2004) (permitting computer-assisted research costs to be recovered as separate item where costs were "simply a straight pass-through of time-based charges paid to the service providers for work done in this case"; noting that a different problem would be presented if the firm paid a flat monthly fee to the service provider or otherwise did not typically charge its clients for such costs as a separate disbursement); *cf. Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257-58 (10th Cir. 1998) (parties did not dispute that Westlaw charges were "expenses normally itemized and billed in addition to the hourly rate").

Finally, Sprint suggests a deduction from the costs incurred by Penncro's counsel (and reimbursed by Penncro) of $8787.50, representing a 50 percent reduction in total airfare expenses charged by Penncro's counsel. As highlighted by Sprint's counsel, nearly every airline ticket purchased by Penncro's counsel in connection with this case cost over $1200.00 and some of those tickets cost as much as $1800.00. The cheapest airline ticket purchased by Penncro's counsel was $980.00. The vast majority of these tickets were round-trip tickets between Philadelphia and Kansas City. In such circumstances, the court agrees with Sprint that these prices reflect tickets that were either purchased at the eleventh hour (with no explanation concerning the need for last-minute planning) or purchased for first-class seats. Either way, the court does not believe that Sprint should bear the full cost of these airline tickets and concludes that the 50 percent reduction suggested by Sprint is appropriate. *See, e.g., Eli Lilly & Co. v. Zenith Goldline Pharm., Inc*., 264 F. Supp. 2d 753, 762 (S.D. Ind. 2003) (absent unusual circumstances, it is not reasonable to shift to the opposing party the costs of first class air travel). In sum, then, the court will award Penncro $87,343.15 in costs incurred by its counsel.

The court turns, then, to the expert fees and expenses that Penncro seeks to recover. While Sprint does not dispute the hourly rate ($310) charged by Penncro's expert, Vincent Thomas, it does contend that it is unreasonable for Mr. Thomas's firm to charge (as it has done) the same hourly rate for the manager, staff and associates that worked with Mr. Thomas in supporting roles. Sprint's counsel avers that the manager who worked with Sprint's expert charged $250 per hour and he opines that the other staff who worked with Mr. Thomas should not charge more than $150 per hour. Sprint also suggests an overall 10 percent reduction in the

25

fees charged by Mr. Thomas's firm to reflect time spent on unsuccessful claims, including the computation of prejudgment interest and "unjust enrichment damages" against Sprint, as the court awarded neither.

As with Sprint's other suggested deductions, Penncro has not responded to these arguments in any respect, making the court's task somewhat more difficult. Nonetheless, it is clearly unreasonable for Mr. Thomas's firm to charge the same hourly rate for Mr. Thomas, plaintiff's testifying expert, as it does for the support staff who assisted Mr. Thomas and the court will utilize the hourly rates suggested by Sprint as supported by affidavit. *See B&H Medical, LLC v. ABP Admin., Inc.*, 2006 WL 123785, at *3 (E.D. Mich. Jan. 13, 2006) (awarding defendants only 20 percent of total amount of expert fees requested in part because defendants failed to provide sufficient information to enable the court to determine whether the hourly rates charged by members of expert's staff were reasonable). The court does not agree, however, that an overall reduction is appropriate for time spent on Penncro's claim for prejudgment interest and its unsuccessful defense of the "loss avoided" issue. The prejudgment interest issue was entirely discretionary for the court (and a prejudgment interest calculation could not have consumed much of Mr. Thomas's time in any event) and the "loss avoided" issue was inextricably intertwined with other issues in the case. Accordingly, the court awards Penncro $143,920.00 in expert fees and expenses. This figure represents 212 hours billed by Mr. Thomas at an hourly rate of $310.00; plus 212.3 hours billed by Mr. Thomas's manager at abn hourly rate of $250.00; plus an additional 167.50 hours billed by other support staff at an hourly rate of $150.00.

In sum, the court awards Penncro $344,197.30 in other fees, costs and expenses.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's amended motion for attorneys' fees, expert fees and costs (doc. 171) is granted in part and denied in part and the court awards Penncro attorneys' fees, costs and expenses in the amount of $1,895,991.30.

**IT IS FURTHER ORDERED BY THE COURT THAT** the clerk of the court shall amend the judgment to reflect this court's award of $1,895,991.30 in attorneys' fees, costs and expenses.

**IT IS SO ORDERED.**

Dated this _____ day of September, 2006, at Kansas City, Kansas.

_____
John W. Lungstrum
United States District Judge

27